Argued February 1, affirmed March 22, rehearing denied April 26, 1921.

# SALEM KING'S PRODUCTS CO. *v.* RAMP.

(196 Pac. 401.)

**Contracts—Courts Only Construe Contracts.**

1. Courts are empowered to construe contracts, but they cannot make contracts for parties.

**Contracts—Definite and Unambiguous Written Words Final Evidence of Intention of Parties.**

2. In construing contracts the primary object is to ascertain the intention of the contracting parties, and, if the words used by them are plain, clear, definite and unambiguous, they will be taken as the final evidence of the intention of the parties.

**Contracts—Rules of Construction not Applied Where Language is Unambiguous.**

3. Where the intent of the parties to a contract is expressed in clear and unambiguous language, there is no need for the application of any of the rules of construction.

---

2. Rule of construction that language used by promisor is to be construed as promisor thought it to be understood by promisee, see note in 12 Ann. Cas. 392.

### Evidence—Contract Held Ambiguous and Hence to Warrant Parol Evidence.

4.   A rider to a contract to pay a minimum of four cents per pound for ten years for loganberries, declaring "if S. raises their buying price to other growers in 1918, or thereafter, this contract will automatically conform with that price," *held* open to other meanings than that the obligation to pay more than four cents is dependent upon two conditions, (1) that if S. has a buying price and (2) that if S. raise that buying price, and parol evidence was admissible to show that it was intended that S. pay the market price if it exceeded four cents, in view of Section 721, Or. L.

### Contracts—Construed Most Strongly Against Party Preparing It.

5.   A written contract will be construed most strongly against the party preparing it.

### Contracts—Construction Implying Good Faith Adopted.

6.   If a contract is susceptible of two constructions, one of which imputes bad faith and the other implies good faith, the latter will be adopted for the reason that every contract implies good faith and fair dealing between the parties.

### Evidence—Parol Evidence Admissible to Explain Ambiguous Contract.

7.   Where the language of a contract is ambiguous, equivocal, or reasonably susceptible of two or more conflicting constructions, it is competent to resort to parol testimony concerning the circumstances under which the agreement was made or to which it relates, including the situation of the subject of the instrument and of the parties to it, in order, not to add to or detract from or otherwise vary the terms of the instrument, but to enable the court to ascertain what the meaning of the parties really is, under Sections 713, 717, Or. L.

### Sales—Facts Held to Show Agreement to Pay Minimum of Four Cents Per Pound for Loganberries Intended Payment of Market Price.

8.   Under a contract to sell loganberries for ten years at a minimum price of four cents per pound, *held*, that it was the intention of the parties that plaintiff should pay the market price when it was in excess of four cents per pound.

### Evidence—Construction of Contract by Agents of One Party Held Admissible.

9.   Where agents had authority to solicit berry-growers to sign contracts and to explain the meaning of the contracts, representations by such agents as to the meaning of the contracts were admissible in evidence where the contracts were reasonably susceptible of the construction given.

### Pleading—Defense Held not to Amount to Admission That Contract was Given Same Meaning as Given to It by Plaintiff.

10.   In an action for specific performance of a contract to sell loganberries for ten years, defendant's first separate defense declaring that plaintiff represented to the defendants that the plaintiff would attach a rider with certain words, but instead a rider differently worded was attached, did not amount to an admission that defendants gave to the rider the same meaning as is given to it by the plaintiff.

From Marion:

GEORGE G. BINGHAM and } Judges Sitting in Banc.
PERCY R. KELLY,

Department 1.

The Salem King's Products Company, a corporation, brought this suit for the purpose of compelling ten several growers of loganberries specifically to perform their respective contracts to deliver loganberries to the plaintiff. There was a decree for the defendants, and the plaintiff appealed.

The King's Products Company is a corporation, and, since it owns practically "all of the entire stock of the Salem King's Products Company," it will for convenience be called the parent company; and for the sake of brevity the Salem King's Products Company will be referred to either as the Salem Company, or as the plaintiff.

In 1917 the Salem Company concluded to establish a plant in Salem for the dehydration of vegetables, fruits and berries. The Salem Company owns or has the right to use a patented process which is said to have decided advantages over any other process used in the dehydration of vegetables, fruits and berries. Work on the plant was begun "the latter part of March or the first of April" in 1917. The "original plans were to build the present unit of the Salem plant, so that the plant could eventually be constructed to four times its original capacity." In other words, the original plan contemplated the ultimate construction of four units. One unit was completed in 1917. As originally constructed the capacity of the plant was "about ten tons per day." Although "a second unit along the lines" as originally planned has not been built, nevertheless the

capacity of the plant has been materially increased. Instead of building additional units "identical with the original unit," the Salem Company pursued other methods for increasing the capacity of its plant; and this was accomplished by adding twenty drying-cars in 1918, thus increasing its drying capacity 50 per cent, and by installing a by-products department in the spring of 1919 with "a capacity of about ten tons per day."

The Salem Company began the erection of this plant with the belief that the Salem Fruit Union would supply it "with all fruits and vegetables." But upon learning that the Salem Fruit Union "could not secure the necessary tonnage of vegetables" and "would not deliver loganberries," the plaintiff company concluded to "put agents in the fields to secure contracts from the growers"; and accordingly on or about July 19, 1917, the Salem Company sent out men, known as field agents, including Guy Coe and Luther J. Chapin, to negotiate contracts with growers.

The field agents were supplied with printed blank forms to be used in making contracts with the growers. This blank form of contract was so designed that it could be used for any products, whether fruits or vegetables or berries. When the field agents were first sent out to secure contracts for loganberries, they were authorized to say to any grower that the Salem Company would agree to pay 4 cents per pound for loganberries each year for the whole or any part of a period of ten years beginning with 1918 and ending with 1927, if the grower would in turn obligate himself to deliver his berries during such stipulated period.

The field agents worked among the growers for a "couple of days" soliciting contracts, but they failed

to secure any contract with any grower. The Salem Company then prepared a rider in the form of a typewritten slip of paper, reading as follows:

"If Salem King's Products Co. raise their buying price to other growers in 1918, or thereafter, this contract will automatically conform with that price."

The Salem Company claims that this rider was prepared for the sole purpose of preserving uniformity in price, so that each year every grower would receive the same price for his berries that any other grower received, and so that in any given year no grower would receive more than any other grower delivering to the Salem Company. The defendants say that this rider was in truth prepared to meet objections made by growers and encountered by the field agents when the latter solicited contracts. The defendants claim that the growers refused to sign contracts because the Salem Company was merely offering to pay an unvarying, fixed price of 4 cents per pound for each year's crop without any stipulation allowing the growers an increased price in the event the market price should be greater than 4 cents per pound. The Salem Company insists that the offer of 4 cents per pound was of itself a sufficient inducement to the growers, for the reason that it was more than was then being offered or paid by any other buyer and, indeed, was from one half a cent to one cent more than had ever before been paid to any of the growers.

The defendants contend that the fixed price of four cents was no inducement at all for a long term contract. The Salem Company says that there could have been no reason for it to have offered to pay a minimum price of four cents per pound with an obligation to pay a higher price in any given year if the

market price in such year exceeded four cents per pound. The defendants answer this statement by saying that the Salem Company was endeavoring to secure enough acreage to insure a sufficient supply of loganberries for its plant, and that its principal object was to tie up about 300 acres of loganberries. It is not necessary to decide whether the rider was prepared to preserve uniformity in price as contended by the plaintiff, or to meet the objections of the growers as contended by the defendants; but the fact remains that the rider was prepared, and the further fact remains that the Salem Company did not secure any contract until the rider was prepared, unless it can be said that the contract with Bruce Cunningham constituted an exception; but as will subsequently appear the Cunningham contract cannot be treated as an exception if his testimony is accepted as a correct version of the circumstances attending the execution of the contract.

After the Salem Company authorized the rider to be attached to the printed form it secured contracts with growers, including B. F. Ramp, Bruce Cunningham, Britt Aspinwall, C. H. Dencer, O. L. Dencer, Clyde Harris, August Lentz, L. S. Murdick, W. Howard Ramp and A. E. Harris.

S. V. Ramp took over B. F. Ramp's berry business on May 16, 1918, and the latter's contract with the Salem Company was assigned to S. V. Ramp, who agreed to assume its obligations; and for that reason S. V. Ramp was made a defendant.

It may assist the understanding if a copy of one of the contracts is here set down, and it may be of further assistance if the words which were written into the contract with a lead pencil or in ink are italicized so as to distinguish them from the printed words in the contract; and we accordingly copy the B. F. Ramp

contract and in doing so italicize the words which were written with a lead pencil or in ink, as follows: "Salem King's Products Co. Office Salem, Oregon.

"This Agreement Made this *30th* day of *July,* 1917, Witnesseth, That Salem King's Products Co., a corporation of Portland, Oregon (hereinafter designated as the 'buyer'), and B. F. Ramp of *Brooks,* Oregon (hereinafter designated as the 'seller'), hereby agree as follows:

"The buyer agrees to buy and the seller agrees to sell, at the prices and terms set out below, produce of the varieties, specifications and designated quantities mentioned below, grown by the seller at *Brooks, Oreg.* for the years 1918, 1919, 1920, 1921, 1922, 1923, 1924, 1925, 1926 and 1927, inclusive.

"1st: It is understood and agreed that legal title to said crop is in the seller and the same is hereby agreed to be conveyed and transferred to the buyer, upon the terms and for the consideration hereinafter mentioned.

"2nd: It is also understood and agreed that the seller will remain in possession of said crop and care for same in a husbandlike manner until delivered by the seller to the buyer.

"3rd: It is understood and agreed that all of said crop shall be of good merchantable quality, free from worms and other imperfections, except as specified, and in good condition for evaporating purposes at Salem, Oregon, at the time of delivery to the buyer, its successors or assigns. All produce not up to specification shall, after delivery and examination of same by buyer, be weighed back and charged against the seller, or the price to be paid to seller. Payment for produce under this agreement shall be made each Tuesday at Salem, Oregon, for produce delivered during the preceding week. The buyer reserves the right to delay payment for $X$ days, if unforeseen conditions shall prevent grading of produce before that time. All containers for delivery of produce shall be furnished by the *Buyer.* All containers furnished by the buyer to seller and not returned by seller will be charged to seller.

"4th: It is understood and agreed that the following list contains the quantity, variety, price per ton, and specifications relating to the crops to be sold.

| Quantity. | Varieties. | Price per ton. | Specifications. |
|---|---|---|---|
| 24 acres. | Loganberries. | F. O. B. Plant. $80.00. | Bush ripe. Acceptance at Brooks in less than 4 ton lots inspector paid by Growers, otherwise by Company. |

"5th: It is understood and agreed that if the seller shall be unable to deliver the produce owing to destruction of crop by flood, frost, or other unavoidable casualty, or if the buyer shall be unable to operate on account of strikes, fire or other unavoidable casualty, this contract shall abate, and the parties hereto shall be relieved from their obligations hereunder for the year in which such casualty or other event above described occurs, upon written notice of either party to the other of the inability to perform by reason of such casualty or other event; otherwise to be in full force and effect.

"6th: It is further understood that the covenants herein contained shall run with the land on which said produce is raised, and shall bind the parties hereto, their heirs, administrators or assigns. And it is further understood that in consideration of the above, the seller has this day received from said buyer the sum of One Dollar in part payment of the purchase price.

"This contract is not valid unless countersigned by the Field Manager.

"B. F. RAMP, Seller.

"Two Witnesses:

"W. HOWARD RAMP.

"Approved:

"SALEM KING'S PRODUCTS CO.,
"By STANLEY ARMSTRONG,
"Field Manager."
"SALEM KING'S PRODUCTS CO.,
"Buyer.
"By GUY R. COE, Agent."

For convenience we shall hereinafter refer to the B. F. Ramp contract as the S. V. Ramp contract. The other nine contracts entered into with the nine several defendants, other than S. V. Ramp, are identical with the S. V. Ramp contract, except that there are differences to be found in respect of the dates of the contracts, the acreage, the period covered, and the place of acceptance.

Most of the ten contracts involved in this controversy were secured by the field agents while soliciting in the field. With one or possibly two exceptions, the contracts were secured by the field agents while in the field and the contract so received took the following course: The field agent carried with him the printed blank form of contract and a carbon duplicate. Appropriate insertions were made in the blank spaces in the original and these insertions were of course by means of carbon paper impressed upon the duplicate. A grower then signed the original and his signature also appeared on the duplicate. The field agent attached his signature to the contract and then sent both the original and duplicate to the field manager for his approval and signature. After signing the contract the field manager retained the original and caused the duplicate to be delivered by mail or otherwise to the grower. In some instances the duplicate was promptly returned to the grower, but in other cases the grower did not receive the duplicate until several weeks, and in one instance not until several months after he had signed it.

The field agents say that in every case the rider was either attached to the contract when signed by the grower or was shown to him either before or at the time of signing. In other words, according to the testimony of the field agents, the growers had knowl-

100 Or.—22

edge of the wording of the rider before they signed
the contracts. If the testimony of the growers is
true, some of the defendants did not see the rider
until receipt of the duplicate from the field manager.
It is conceded, however, that without exception the
rider was attached to the duplicate when received by
the grower from the field manager; and it may be
added that every defendant, except one, received his
duplicate at some time in 1917.

With the exception of Britt Aspinwall, all of the
defendants made deliveries in 1918 either to the Salem
Company or to some other canner or dealer desig-
nated by the Salem Company. Aspinwall had leased
his loganberry acreage to a tenant who refused to
deliver to the plaintiff; and since Aspinwall's con-
tract of lease with the tenant was not such as to
enable Aspinwall to compel the tenant to deliver to
the plaintiff, Aspinwall was obliged to and did settle
with the plaintiff by paying about $500 as damages.
In February, 1918, the federal government com-
mandeered the plaintiff's plant, and for about a year
the plant was engaged in dehydrating potatoes and
other products in fulfillment of contracts with the
American and French governments. The plaintiff
was permitted by the government to handle only a
limited quantity of loganberries in 1918, and for that
reason the Salem Company directed that some of the
defendants deliver their berries to other canners or
dealers designated by it. However, the deliveries
made in 1918, whether made directly to the plaintiff
or to some other canner or dealer, were made pursu-
ant to and in recognition of the contracts executed by
the growers and the Salem Company in 1917.

In February, 1919, the Salem Company concluded
to pay to all the growers with whom it had made con-
tracts, a bonus of one half a cent a pound for the

crop of 1919. The reason assigned by the plaintiff for giving this bonus is explained by Mason Wittenberg, the president of the Salem Company, who testified that labor was high and

"I felt it our duty to give the grower a further bonus of one-half cent for 1919 to take care of his additional cost."

In February and March of 1918, George Judd, as a representative of the Salem Company, in company with Luther J. Chapin, who was then the field manager, visited the defendants and other growers and "told them we were going to give them half a cent bonus to help take care of the extra cost of handling the crop this year." At some time in the spring of 1919, but prior to the middle of April, the Salem Company, in the language of its president, "decided we would need more loganberries, and as the market had advanced some we decided to secure them, and it would be necessary to raise our contract price. So we raised our contract price to five cents for the years 1919, 1920 and 1921; and four cents thereafter on a ten-year contract." At some time in the latter part of April or the early part of May, 1919, the plaintiff did enter into contracts binding it to pay five cents per pound for the crops of 1919 and the two following years.

On about April 15, 1919, some of the growers, including some of the defendants, who had contracted with the plaintiff met with the officers of the Salem Company at its office in Salem and discussed the subject of the price to be paid for the crop of 1919. There is a conflict in the evidence not only as to what was said at this meeting but also as to the result of the meeting. The defendants assert that the object of the growers in meeting with the officials of the Salem Company was to ascertain whether the com-

pany would pay more than four cents for the crop of 1919; and the plaintiff admits that such was the object of the growers, for the president of the Salem Company testified:

"There had been an agitation amongst the growers to procure a higher price along about the middle of April, and all of the growers came down to the plant and stated that they desired an advance in price on their contracts."

Although both the plaintiff and the defendants are agreed that the object of the growers who attended the April meeting was to secure more than four cents per pound, the parties differ as to the amount of the increase asked and the reason upon which the claim for an increase was based by the growers. The plaintiff, through its officers Mason Wittenberg and George F. Judd, says in substance that the growers were advised that the plaintiff had decided to contract for more berries at five cents per pound for the next three years, and that the plaintiff intended to pay all the growers then under contract the same price of five cents per pound for the next three years, together with a bonus of a half a cent for the year 1919, thus fixing the price to be paid for the defendants' berries at five and one-half cents for the crop of 1919, five cents for the 1920 and 1921 crops, and four cents for the subsequent crops. All the growers, according to the contention of the plaintiff, who were present at the April meeting, appeared to be satisfied with the announcement that the plaintiff intended to pay five and one-half cents for the 1919 crop, except S. V. Ramp, who said "he should have seven and one-half cents." The point attempted to be made by the plaintiff is that the growers were asking for "an advance on account of the increased cost," and that the market price did not enter into the calculation.

Moreover, the plaintiff says that the market price was at that time seven cents per pound, although it is proper to add that the defendants say that there is nothing to show that any of the growers had knowledge that such was the price at that time; and, indeed, there is evidence indicating that at least some of the defendants were not aware that the market price was seven cents a pound, if such was the market price. All the defendants were not present at the April meeting; but the seven defendants who did attend testified substantially like one of them who said that the growers claimed

"That under the contract they were entitled to the market price, and to have this company buying on the market."

When speaking of the April meeting, Mason Wittenberg stated on cross-examination:

"There was some contention that they should have the market price."

Again on cross-examination Mr. Wittenberg testified:

"This point was raised by Mr. Ramp that we should pay them the market price."

Mr. Judd stated on cross-examination:

"As I remember Judge McNary (who was acting as attorney for the growers) started to make his remarks and brought up that contention about the market price. I stopped him because I did not want to get an argument started there with our growers."

The point attempted to be established by the defendants is that at the April meeting the growers were demanding the market price and were contending that the rider obligated the plaintiff to buy on the open market and entitled the growers to the market price.

The officers of the plaintiff say that as a result of the April meeting they thought that, with the exception of probably one person, all the growers were satisfied and would make deliveries, and that the growers, as explained by Mr. Wittenberg, "felt there was not much in their claim as to market price"; but on the other hand the defendants say that they made unequivocal demands for the market price and unequivocally declared that when they signed the contracts it was represented to them that they would receive the market price in the event the market price exceeded four cents per pound, and that the terms of the rider entitled them to the market price.

A committee of three, including Bruce Cunningham, S. V. Ramp, two of the defendants, and a third grower who is not a defendant, was appointed by the growers to confer with the officers of the plaintiff. This committee met with Mr. Judd at some time in May, 1919; and according to the testimony of Cunningham and Ramp the committee informed Mr. Judd that the growers "will not deliver the berries for less than the market price"; and thereupon Mr. Judd declared in effect that—

"They would not buy on the market, or pay the market price this year, next year or any other year under the contract."

Berry-picking commenced on June 23, 1919. When the picking began the market price was nine cents per pound. The picking season does not last more than about six weeks at the most. The berries are highly perishable and require prompt attention and on that account it is the practice of growers to make arrangements for the sale of their berries before picking them, and because of this practice the price obtained at the beginning of the picking season, and not the

fluctuations occurring at the end of the picking season, is taken as the market price where there is a contract for the delivery of the entire crop.

The ten defendants refused to make deliveries in 1919; and because of such refusals the plaintiff on July 1, 1919, began this suit to compel the defendants specifically to perform their several contracts.

A preliminary mandatory injunction was issued on July 2d requiring the defendants to deliver their berries to the plaintiff. The market price, as already stated, was nine cents when picking began on June 23d, and probably the market price was still nine cents at the time of the issuance of the injunction, although the evidence indicates that towards the end of the picking season the price may have made a slight advance. The plaintiff conceded that it was obliged to pay the defendants five and one-half cents under the terms of the rider, for the reason that it had in the spring of 1919 made contracts for berries at five cents and in addition had promised the defendants a bonus of half a cent a pound; and hence the controversy involved three and one-half cents per pound, or the difference between five and one-half cents admitted by the plaintiff to be due the growers and nine cents claimed by the defendants. The preliminary mandatory injunction directed the plaintiff whenever it received berries to pay five and one-half cents directly to the growers and three and one-half cents to the clerk of the court to await the determination of the suit. The injunction was obeyed by the plaintiff and the defendants. When the picking season ended and deliveries had been completed the clerk of the court held in his hands, $23,365.11. If the plaintiff was entitled to specific performance at five and one-half cents, it was entitled to a return of

the moneys so held by the clerk; otherwise the defendants were entitled to receive the moneys in proportion to their respective deliveries.

The complaint tells about the execution of the contracts with the several defendants, mentions the fact that deliveries were made in 1918 pursuant to the terms of the contracts, avers that five and one-half cents was the limit of the plaintiff's obligation in 1919, and alleges that the defendants refused to deliver any of the 1919 crop. The complaint then proceeds to recount the different circumstances relied upon by it for specific performance. The complaint avers that remedies at law would require multiplicity of actions. It is further alleged that practically all the 1919 loganberry crop has been covered by contracts, so that it is impossible for the plaintiff to replace the berries expected to be received from the defendants; that the company has spent large sums in advertising and incurred a large expense in making preparations for handling the defendants' berries; that relying upon the defendants' contracts the plaintiff has made resale contracts which it cannot fulfill unless the defendants deliver their berries; that if the plaintiff fails to fulfill its resale contracts it will be irreparably damaged in respect of its trade name, goodwill and reputation. Furthermore, the plaintiff says that if it should replace the berries expected to be received from the defendants, or if it goes into the open market and buys, it will be compelled to pay more than five and one-half cents per pound, with the result that it will be required to pay the advanced price not only for the berries bought in the open market, but also under the terms of the rider it will be required to pay the same advanced price for berries already under contract.

The complaint concludes with a prayer which, among other things, asks that the defendants be compelled to deliver to the plaintiff all berries raised by them on the lands covered by the contracts. In this connection it is proper to explain that the plaintiff does not ask that the court attempt to compel the defendants to raise berries, but the court is only asked to compel the defendants to deliver berries if any are raised on the lands concerning which the parties contracted.

Besides denials mingled with admissions and allegations the answer contains four further and separate defenses.

Because of the nature of one of the contentions made by the plaintiff it will be necessary to give a detailed statement of the first defense. The defendants aver in their first separate defense that the plaintiff solicited defendants to enter into contracts to sell loganberries raised by them during the period beginning with 1918 and ending with 1927; and that in order to induce them to enter into such contracts the plaintiff represented that its purpose was to become assured of a large supply of loganberries to use in manufacturing certain products which plaintiff proposed to manufacture and market, and that the plaintiff would immediately build and operate in the Willamette Valley additional manufacturing plants; and that this would furnish an additional market to the loganberry growers of the Willamette Valley. The defendants say that the building and operating of such additional plants was a valuable inducement to them "to contract their berries to plaintiff in that the growing of loganberries in the vicinity of defendants' said lands would be stimulated thereby, and additional demand would be created for loganberries for manufacturing purposes, and the building of such

additional plants would insure activity by plaintiff as a purchaser of loganberries on the market.''

The defendants further allege that the plaintiff also represented to them:

''That it would at all times during the life of its contract with defendants be in the market during each and every loganberry season for the purchase of loganberries and would purchase loganberries upon the open market. That the contract tendered to these defendants for execution fixed a price of four cents per pound for such berries. That these defendants refused to execute the contract as tendered, whereupon plaintiff agreed that if these defendants would sign said contract, which was on a printed form plaintiff would in all years during the life of said contract pay the highest market price to these defendants and each of them for loganberries, but in no event should the price paid to these defendants be less than four cents per pound for each pound of loganberries delivered to plaintiff under the terms of said contract, and plaintiff further agreed that it would, before approving and signing said contracts, and each thereof, attach thereto and make a part thereof, a clause providing that 'Salem King's Products Co. will pay upon this contract in all years the highest market price for loganberries, but in no event less than four cents per pound

''That the contract in the form which it was presented to defendants was in duplicate and on a printed form, and it was represented by plaintiff to defendants, and each of them, that the only convenient way in which to transact the said business was for defendants to sign said contracts in duplicate after which signature the said contracts would be signed on behalf of plaintiff by officers of plaintiff duly authorized so to do, and it was also represented by plaintiff to defendants, and each of them, that if they would so execute said contract in duplicate plaintiff would also execute the same, attach to both duplicates of the contract the clause aforesaid and return one thereof to each of the defendants.''

Continuing the defendants aver:

"That defendants, and each of them, believed and relied on each and every of the representations so made by plaintiff and so believing and relying and not otherwise executed the said printed form of contract, and defendants, and none of them, would have signed said contract but for said representations and promises. The said representations were in every case made by plaintiff with intent that they should be believed and relied on by defendants, and each of them, but said representations were false, were known by plaintiff to be false and were made with intent to deceive and defraud defendants, and each of them. That plaintiff had no intention of constructing the additional manufacturing plants aforesaid, and in fact has not done so. That plaintiff had no intention of purchasing berries on the open market and in fact has made no such purchase. That the clause attached by plaintiff to said contract did not conform to plaintiff's representations but was as follows: 'If Salem King's Products Co. raises their buying price to other growers in 1918, or thereafter, this contract will automatically conform with that price.' That if plaintiff had purchased berries on the open market the clause attached to said contract would have effectuated the intent of the parties and would have obligated plaintiff to pay defendants, and each of them, the market price of said berries. That defendants on receipt of said contracts believed and relied on said representations as to such purchases so to be made, and so believing and relying made no complaint that the contract as drawn and executed by plaintiff did not conform to the agreement entered into."

The defendants tell about the use made of the plant in 1918 for dehydrating potatoes for the government and the defendants also tell about having delivered their crops in 1918 to the plaintiff or persons designated by the plaintiff, and then the defendants allege that when the picking began in 1918 the market

price was from three and one-half cents to four cents per pound, and that when they delivered their berries in 1918 for four cents per pound they believed that they were receiving the highest market price for them.

The answer continues with the following paragraph:

"That the price of loganberries in the Willamette Valley in the State of Oregon and in the location where defendants' said loganberries are grown at the time the restraining order herein was passed, was and now is nine and one-quarter cents per pound delivered, and has been in excess of four cents per pound since the month of March, 1919. That in the month of April, 1918, plaintiff began inquiring of defendants and said other loganberry-growers as to whether they would deliver their loganberries grown in the year 1919 to defendants at four cents per pound, and about the fifteenth day of April, 1919, these defendants notified plaintiff that they would not deliver any berries to plaintiff under the pretended contract fraudulently prepared by plaintiff as hereinabove set forth, demanded cancellation of said contract and told plaintiff that it must go upon the market for such berries as it needed unless plaintiff would pay to defendants for their berries the market price as agreed upon as hereinabove alleged. The plaintiff then and there refused to pay to defendants, or any of them, the market price of said berries, and this was the first knowledge of defendants, or either of them, that plaintiff would not perform its contract as agreed upon."

The second defense alleges a failure of consideration. This defense is based upon the theory that the alleged failure of the plaintiff to expand its plant in conformity with its alleged promise and the refusal of the plaintiff to buy loganberries on the open market in conformity with its alleged representation

and promise, amounted to a failure of consideration for the contracts.

An estoppel is pleaded in the third separate defense. It is alleged in this defense that the plaintiff represented to the defendants:

"That the clause which plaintiff proposed to attach as a rider to said contract after it had been signed by these defendants, and each of them, would bind and obligate plaintiff to buy loganberries from the grower and on the open market in each and every loganberry season covered by said contract. That these defendants, and each of them, are farmers, are not learned in the law governing construction of contracts, and believed and relied upon the said representations, and so believing did not complain that said rider is not in the language in which it was promised to be."

It is then averred that if the rider attached to the contract does not in fact obligate the plaintiff "to have a buying price in good faith to the grower upon the open market during each and every loganberry season covered by said contract," the plaintiff ought to be estopped to assert that it is not so obligated to buy from the grower upon the open market.

The alleged fourth defense is in substance an affirmative declaration that the plaintiff has an adequate remedy at law.

The suit was heard and decided by the two circuit judges for the third judicial district sitting together. There was a decree canceling the contracts and directing the clerk to distribute the moneys in his hands to the several defendants in proportion to deliveries made by them. The plaintiff appealed. AFFIRMED.

For appellant there was a brief over the names of *Mr. Prescott W. Cookingham, Mr. Guy C. H. Corliss*

and *Mr. James G. Heltzel,* with an oral argument by *Mr. Heltzel.*

For respondents there was a brief over the name of *Messrs. McCamant, Bronaugh & Thompson,* with an oral argument by *Mr. W. Lair Thompson.*

HARRIS, J.—It appears from the foregoing statement that the plaintiff concluded in 1917 to construct a plant in Salem for the dehydration of fruits, vegetables and berries; and, accordingly, such a plant was erected in 1917, and since that time it has been in operation. The plaintiff does not confine its attention to berries. The plant is operated about 10 months in the year, and only about one month of that period is devoted to loganberries. In order to assure itself of a supply of loganberries the plaintiff sent out field agents in July, 1917, with authority to negotiate with growers of loganberries for deliveries to be made during a period of 10 years beginning with 1918. These field agents were given printed forms of contracts. The field agents worked among the growers for a "couple of days," but without success. The plaintiff then authorized a rider to be attached to the printed form; and subsequently the defendants signed contracts. It is conceded by all concerned that the rider is a part of the contracts made with the defendants.

The Salem Company had a contract with the parent company under the terms of which the whole of the products manufactured by the former was sold to the latter for cost plus 10 per cent. The Salem Company had no resale contracts except the one with the parent company. The Salem Company had not done any advertising. The parent company, however, had made many large resale contracts on the faith of get-

ting the Salem Company's output for 1919; and the parent company had conducted an extensive and expensive advertising campaign in order to get resale contracts.

The defendants made deliveries in 1918; but in 1919 they refused to make deliveries and out of such refusals arose this suit. Each of the ten defendants has a separate contract with the plaintiff; but, notwithstanding this single suit may be said to embrace ten suits, no party has objected to the joinder of these ten growers as parties defendant in a single suit, presumably for the reason that the contracts are substantially alike and the contentions of the defendants are so much the same that all parties tacitly agreed that a single suit would be the most convenient method of settling the controversies.

The dispute centers around the typewritten rider attached to the printed part of the contract. The plaintiff insists that the language of the rider is plain and unambiguous and also free from fraud or mistake, and is conclusive upon the parties; and that therefore the obligation of the plaintiff was to pay five and one-half cents and no more for the crop of 1919, while the obligation of each of the defendants was to deliver to the plaintiff all the berries grown on the acreage covered by his contract. The plaintiff insists that these field agents did not make any of the representations attributed to them by the defendants; and the plaintiff also insists that even though it be assumed that the field agents did make the representations as alleged by the defendants, nevertheless the plaintiff is not bound by these representations for the reason that the field agents had authority only to negotiate and did not have authority to execute contracts, and that the defendants had knowledge of such limited authority because the printed form

provided that "this contract is not valid unless countersigned by the field manager." The plaintiff says that none of the executive officers made any of the representations relied upon by the defendants. The plaintiff contends that the rider means that the defendants are to receive four cents each year for their loganberries; but that, although the plaintiff is not obliged to buy from other persons or growers in any year, nevertheless, if it does elect to buy additional berries and if it pays more than four cents for such additional berries, then in such event and only in such event the defendants are entitled to receive the same advanced price for their berries. In support of its construction of the rider, the plaintiff points to the alleged fact that notwithstanding the market price exceeded four cents in 1918, the defendants delivered their berries to the plaintiff, thus indicating that the defendants themselves understood the contract to mean that they were not entitled to receive more than four cents, even though the market price should exceed four cents, unless the plaintiff actually bought additional berries for more than four cents.

The defendants disagree with the construction placed upon the language of the rider by the plaintiff. The defendants argue that whether the rider is construed by itself or is viewed in the light of what preceded the execution of the contract, in either event the contract cannot be given the construction contended for by the plaintiff. The defendants insist that the rider, standing alone and without extrinsic evidence of the circumstances under which it was made and without any evidence of the negotiations which preceded its execution, means that each year the plaintiff must have for other growers a good faith buying price.

1-3. Courts are empowered to construe contracts, but they cannot make contracts for parties. The primary object is to ascertain the intention of the contracting parties, and if the words used by them are plain, clear, definite and unambiguous, they will be taken as the final evidence of the intention of the parties; and even though contracts contain onerous provisions courts will not, in the absence of fraud or mistake, afford relief from them. It is the obligation of a party to perform his unambiguous contract; and if a party be unwilling to perform it is the duty of the court specifically to enforce such contract where the remedy at law is not adequate. Where the intent of the parties is expressed in clear and unambiguous language, there is no need for the application of any of the rules of construction. Most, if not all, of the rules of construction applied by courts have been framed and adopted as instrumentalities to be used as aids in ascertaining the probable intention of the parties. Let us now turn to the rider and attempt to determine its meaning.

4. The contracts cover a period of ten years with an agreement by the plaintiff to pay a minimum of four cents per pound. The rider declares:

"If Salem King's Products Co. raises their buying price to other growers in 1918, or thereafter, this contract will automatically conform with that price."

The contract must be considered as a whole; and the rider must be considered in the light of the stipulation concerning the minimum of four cents. The rider is introduced by the word "if." This is a word of condition, so that the agreement to pay more than four cents is conditional. The plaintiff contends that the obligation to pay more than four cents is dependent upon two conditions; the contention being

100 Or.—23

that the rider means that if the plaintiff has a buying price and if the plaintiff raises that buying price ''this contract will automatically conform with that price.''

We are unable to agree with the plaintiff in its contention that its construction is *the one* which must necessarily be placed upon the rider; nor can we agree with the plaintiff that its construction is the only one of which the rider is fairly and reasonably susceptible. Nor can we agree with the suggestion of the defendants that the language of the rider was deliberately chosen by the plaintiff's representatives with a trickish purpose. Although the plaintiff's construction is clearly not the only construction which may be placed upon the rider nor the only construction which can be fairly given to the rider, it may be assumed that the plaintiff's construction is at least one of the constructions which may be fairly and reasonably placed upon the rider.

Our next inquiry is: Is the rider reasonably susceptible of another equally proper construction? Is it not a fair and reasonable interpretation to say that the rider assumes and implies the existence of a buying price and that the plaintiff will actually have a buying price? When the plaintiff says: That it ''raises their buying price'' in 1918 or thereafter, does not the Salem Company speak of that which it will have? The word ''their'' is a possessive pronoun, and in the rider it is used with the value of an adjective. When the plaintiff speaks of raising, it must have something to raise; and that something is ''their buying price.'' Is it not reasonable to say that the word ''if,'' the word of condition, only refers to the word ''raises'' and necessarily assumes the existence of ''their buying price''? Is it not just

as reasonable to say that the existence of "their buying price" is necessarily implied, as contended by defendants, as it is to say that a second "if" is necessarily implied with reference to "their buying price," as contended by the plaintiff? It seems to us that, even though it be said that the rider is reasonably susceptible of the construction given by the plaintiff, it is also fairly and reasonably susceptible of a second and equally proper construction; and since the rider was attached to the contract for the benefit of the defendants, the plaintiff's construction must be rejected, for by the terms of Section 721, Or. L.:

"When different constructions of a provision are otherwise equally proper, that is to be taken which is most favorable to the party in whose favor the provision was made."

*Moore* v. *Aetna Life Ins. Co.*, 75 Or. 47, 53 (146 Pac. 151, Ann. Cas. 1917B, 1005, L. R. A. 1915D, 264); *Byron* v. *First Nat. Bank,* 75 Or. 296, 300 (146 Pac. 516). This statutory rule is not an innovation, but it is merely a legislative approval of the rule previously established by the judiciary: 22 C. J. 1174.

5. Furthermore, one of the rules by which an ambiguous contract may be interpreted is that the writing will be construed most strongly against the party preparing it; and, although it has been said that this is the last rule which courts will apply, and then only when a satisfactory result cannot be reached by the other rules of construction, yet if this rule is applied it compels a rejection of the plaintiff's construction: 13 C. J. 544; *Loomis* v. *McFarlane,* 50 Or. 129, 134 (91 Pac. 466).

6. An agreement to have a "buying price" calls for a good faith buying price; for the rule is that if

a contract is susceptible of two constructions, one of which imputes bad faith and the other implies good faith, the latter will be adopted for the reason that every contract implies good faith and fair dealing between the parties: 13 C. J. 540.

7. Where the language of the contract is ambiguous, equivocal or reasonably susceptible of two or more conflicting constructions, it is competent to resort to parol testimony concerning the circumstances under which the agreement was made or to which it relates, including the situation of the subject of the instrument and of the parties to it, in order, not to add to or detract from or otherwise vary the terms of the instrument, but to enable the court to ascertain what the meaning of the parties really is: Sections 713, 717, Or. L.; *Baker County* v. *Huntington,* 46 Or. 275, 278 (79 Pac. 187); *Wade* v. *Northrup,* 70 Or. 569, 590 (140 Pac. 451). The only purpose of parol evidence in any such case is to enable the court to understand what the language used by the parties really means, and hence evidence which has no tendency to aid in the construction of the writing or to explain any ambiguity in it cannot be received: 22 C. J. 1179. In order that the judge may be placed in the position of those whose language he is to interpret, it is competent to consider all the facts and circumstances leading up to and attending the execution of the contract, the relation and condition of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract: 13 C. J. 542, 544; 22 C. J. 1183; 6 R. C. L. 839, 849.

8. We now direct attention to the evidence concerning the facts and circumstances preceding and accompanying the execution of the contracts, as well as evidence of facts occurring after the execution of the

instruments; and when all the evidence will have been considered it will be clear that the construction contended for by the plaintiff must be rejected. The evidence does not satisfactorily show the exact date when the field agents were first sent out among the growers, nor does it satisfactorily show the exact date when the field agents were first authorized to use the rider; although it is probably correct to say that the field agents began soliciting on Thursday, July 19th, and that the field agents were authorized to use the rider some time on or between Friday, July 20th and Monday, July 23d. Notwithstanding the field agents were actively engaged in soliciting contracts, not a single grower signed a contract until after the authorization of the rider, excepting Bruce Cunningham; but if his testimony is believed his contract was not an exception. In other words, the growers refused to sign the printed contract; and every grower, except A. M. LaFollett, who refused, did so for the reason that the printed form did not allow the growers any increased price in the event the market price exceeded four cents. A. M. LaFollett, a grower but not a defendant, based his refusal upon the ground that it had not been his practice to contract for more than a single crop; and, furthermore, he had been selling his berries to another party who had been paying him the market price and with whom he was apparently satisfied.

B. F. Ramp and six of the other defendants were approached by an agent before the use of the rider was authorized, and only three of the defendants were seen for the first time after the rider was authorized. B. F. Ramp and six of the defendants, without exception, according to their testimony and the testimony of corroborating witnesses, refused to sign for the

reason, expressed by them to the agent, that the printed form precluded them from getting the market price in the event it exceeded four cents; and every one of the defendants who had been interviewed before the authorization of the rider was again seen after the plaintiff authorized the use of the rider and was in effect told that the rider met the objection upon which the refusal had been based. The defendants say with one voice, and the overwhelming weight of the evidence is, that the field agents represented that the Salem Company was anxious to secure acreage; that the company intended to increase its plant; that the process used by the Salem Company enabled it to compete with any other manufacturer; and that it would be in the market every year for berries. Four of the defendants, according to their testimony, never saw the rider until they received their duplicates; the remaining contracting defendants say they saw the rider. Every one of the defendants who saw the rider before signing the contract says that the agent explained that the rider guaranteed the payment of the highest market price with four cents as the minimum. The defendants who did not see the rider until after signing the contract say, without exception, that the agent told them that a rider would be attached to the instrument guaranteeing the highest market price with four cents as the minimum. In other words, in every instance where the agent exhibited the rider to the defendant the agent told such defendant that the rider guaranteed the highest market price; and in every instance where the rider was not shown before the defendant signed the contract, such defendant was told that a rider or clause, or sticker would be attached to the contract guaranteeing to such defendant the highest market price.

In short, all the signers of the ten contracts involved in this controversy were told by an agent that the plaintiff would buy on the market each year and that the rider guaranteed the payment of the highest market price with four cents as the minimum. When S. V. Ramp took over the B. F. Ramp contract he was informed that the rider guaranteed the highest market price. B. F. Ramp and five of the defendants expressly testified that after they received their duplicates they believed, not only on account of the representations made by the agents but also because of their reading and understanding of the language of the rider, that they would be entitled to the highest market price; and the plain inference to be drawn from the testimony of the remaining four contracting defendants is that they too understood from the language of the rider itself that it guaranteed the highest market price, for there is no evidence to the contrary except the circumstances connected with the 1918 deliveries and an alleged admission attributed to one of the defendants. S. V. Ramp testified that his "interpretation of the contract since its assignment has been that the company was to pay you the highest market price."

The plaintiff claims that the market price exceeded four cents in 1918 and that notwithstanding that fact the defendants made deliveries without objection. There was substantial evidence to the effect that the market price was four cents or less when the picking season opened in 1918, although there is evidence to the effect that at the end of the season the price advanced to five or five and one-half cents. One of the plaintiff's own witnesses, a buyer with a complete knowledge of the market, said that the price to the growers was three and one-half or four cents at the

beginning of the season; and in their written opinion the trial judges say:

"The transactions of 1918 we think are not important for the reason that the market price at the opening of the season, was $80 per ton, and while it advanced after picking commenced, under our interpretation of the contract, the price at the opening of the season would govern."

Two of the defendants, S. V. Ramp and August Lentz, asked for more than four cents in 1918 because of the advance in price towards the end of the season. None of the other defendants demanded more than four cents because they believed they were receiving the highest market price; and, indeed, according to the overwhelming weight of the evidence they were in truth receiving as much as or more than the amount of the market price if the market price be determined by the price prevailing at the beginning of the picking season.

Two of the defendants received intimations towards the end of the 1918 season that the plaintiff did not intend to pay the highest market price; five of the defendants learned for the first time in February, 1919, when visited by Judd and Chapin, that the plaintiff did not purpose to buy in the open market or to pay the highest market price; and the remaining defendants did not know until April, 1919, that the plaintiff had taken the definite position that it would not buy in the open market or pay the highest market price. Anyone reading the record cannot but be impressed with the idea that the defendants all believed that they were entitled under the contract to the highest market price.

August Lentz protested and became "mad" when the plaintiff refused to pay more than four cents in 1918. S. V. Ramp consented to be satisfied with four

cents in 1918 only after being told that the plaintiff
had resold the berries and that the plant had been
commandeered; but he was careful to inquire later on
what the plaintiff intended to do in 1919. W. How-
ard Ramp and L. S. Murdick told Judd and Chapin
in February, 1919, that they wanted the market price.
The April, 1919, meeting was the natural result of
the information coming to growers that the plaintiff
did not intend to pay the market price. The de-
liveries made in 1918 do not, in the circumstances
shown by the record, prove that the defendants then
construed the contract as the plaintiff now construes
it. The conduct of the defendants indicates protest
against rather than acquiescence in the refusal of the
plaintiff to pay the highest market price; and, ac-
cording to the testimony of the defendants, there
were objections by the defendants upon every occa-
sion where the plaintiff either intimated or frankly
declared that it would not buy on the open market or
pay the highest market price.

9. The plaintiff argues that the field agents were
agents with limited authority; that the provision re-
quiring the signature of the field manager was notice
to the defendants of such limited authority; and that,
therefore, the plaintiff is not bound by any repre-
sentations made by the field agents about the expan-
sion of the plant or about the plaintiff's alleged pur-
pose each year to buy on the market. It is true
that the field agents did not have any authority to
make a contract; but it is also true that they did
have authority to solicit growers to sign and to ex-
plain the meaning of the contract; for Mason Witten-
berg, president of the company, testified that the
agents were authorized ''to explain the contract, the
price, and the terms of the growers, and secure the
growers' signature to the contract.'' According to the

testimony of the defendants and other witnesses who were present when some of the contracts were signed, the field agents did explain the language of the rider either by showing the rider and saying that it meant the highest market price, or by saying that a rider would be attached guaranteeing the highest market price. This is not a case where the rider plainly means one thing and one thing only and the agent has explained that it meant something different; but this is a case where the language of the rider is reasonably susceptible of two constructions and an agent with authority to explain the rider exercises his authority and does explain the rider by giving to it one of the constructions of which it is reasonably susceptible.

Moreover, there is substantial evidence that some of the executive officers, executives vested with authority to bind the plaintiff, told some of the defendants that the rider meant exactly what the two field agents, Guy Coe and Luther J. Chapin, were telling and had told the growers it meant. Representatives of the plaintiff saw Bruce Cunningham three times before he finally signed a contract dated July 20, 1917. It will be remembered that Stanley Armstrong was the field manager in 1917; and it may be further explained that he continued to act as field manager until February, 1918, when he severed his connection with the plaintiff, and, according to our understanding, he was immediately succeeded by Luther J. Chapin as field manager. Cunningham testified that Chapin and Armstrong were together and while together they

"Talked about what they were going to do; the plant they was building down here, what they was going to do, what they was going to build to it; they said they were going to put up three more units, and

they would be continually in the market for berries, and that they wanted 1,000 acres of berries.''

Cunningham testified that they (Chapin and Armstrong) said:

''They had a very good proposition, that it was the best thing ever presented to the growers, that they would give us four cents and in addition to that they would put a rider on the contract that would protect us in the line of future advance in the market. * * I was led to believe they would be continually in the market, and if the market would go up we would get the benefit of the rise. I asked Mr. Armstrong what assurance would we have that we would get that rise; he said: 'This slip we attach protects you.' ''

A. E. Harris, another defendant, testified that in May, 1918, a time when Chapin was field manager, Chapin told him that ''this [the rider] guarantees you the market price.'' According to the testimony of August Lentz he was interviewed at his place first by Coe and afterwards on July 21, 1917, by Chapin. Lentz says that Chapin filled out a contract but that he did not then sign it; that after talking it over with his wife and boys at the end of three or four weeks he went to the plaintiff's office and there found Chapin who told him—

''This saves it, if any raise in price we raise, and we pay you the highest price for berries.''

Chapin testified that his connection with the plaintiff dated from May, 1917, and that ''during the first few months I had charge of the office here in the absence of the field manager, directing the stenographer and attending to the correspondence, general duties.'' S. V. Ramp testified that after berry picking in 1918 he saw Mr. Walker (the plant manager) and—

''I said: 'What are you going to do about next year, are you going to pay the market price or not?'

He said: 'You can depend we will be fair to the grower.'"

Thus it is seen that there is evidence that the executive officers were themselves making the same representations concerning the proposed expansion of the plant and the same representations concerning the purpose of the plaintiff to buy on the open market and were also making the same explanation of the meaning of the rider as was made by the field agents.

10. We cannot agree with the contention of the plaintiff that the first separate defense amounts to an admission that the defendants gave to the rider the same meaning as is given to it by the plaintiff. In substance the first separate defense declares that the plaintiff represented to the defendants that the plaintiff would attach a rider with certain words, but instead a rider differently worded was attached. It is true that in this defense the defendants allege that if the plaintiff bought in the open market at an advanced price, such act would automatically increase the price to the defendants. However, nowhere in this defense do the defendants say that a failure to buy on the open market at an advanced price prevents the defendants from recovering an advanced price; but upon the contrary in their third separate defense the defendants say that, regardless of the words actually used in the rider, the plaintiff ought to be estopped to say that the rider does not mean that the plaintiff is obligated to buy on the open market each season.

The evidence is conflicting. The witnesses for the defendants considerably outnumber those for the plaintiff; and although the issues are to be determined by the weight of the evidence rather than by

the number of the witnesses, yet the fact that so
many witnesses substantially agree with each other
upon material matters is not without some weight,
in the circumstances shown by the record. The trial
judges were in a far better position to appraise the
value of the testimony of the respective witnesses;
for the trial judges had the benefit of seeing and hear-
ing the witnesses testify, while we are without that
advantage, since our information concerning the sub-
ject of the controversy and the persons and parties
connected with it is confined to the cold and inanimate
words printed in the record. The trial judges held
that—

" 'Their buying price to other growers' under the
usage of the business, means the price paid in fair
competition at or about the opening of the picking
season.''

We think the contract is ambiguous and is fairly
and reasonably susceptible of the construction con-
tended for by the defendants and also, we may
assume, fairly and reasonably susceptible of the con-
struction contended for by the plaintiff. If the
contract is construed standing alone and by itself,
the ambiguity must be resolved against the plaintiff,
because the plaintiff concedes that it framed the rider
and plainly on its face the rider was prepared for the
benefit of the defendants. If the contract is viewed
in the light of what preceded and accompanied as
well as what followed its execution, the ambiguity
must likewise be resolved in favor of the defendants.
The trial court resolved the issues of fact against the
plaintiff. The evidence does not warrant us in dis-
turbing the findings made by the trial judges. The
plaintiff refused to perform the contracts, except as

construed by it; and this justified the trial court in decreeing a cancellation of the contracts.

The decree is affirmed.

AFFIRMED.  REHEARING DENIED.

BURNETT, C. J., and BENSON and McBRIDE, JJ., concur.