Argued January 10, reargued April 22, reversed and remanded
June 25, petition for rehearing denied September 9, 1952

## MARR ET AL. *v.* PUTNAM ET AL.
246 P. 2d 509

4

*Norman K. Winslow,* of Salem, argued the cause for appellants. With him on the briefs was W. C. Winslow, of Salem.

*Wallace P. Carson* and *Ralph E. Moody,* of Salem, argued the cause for respondents. With them on the

brief were Moody & Lamkin, Allan G. Carson, and Douglas L. Hay, of Salem.

Before BRAND, Chief Justice, and ROSSMAN, LUSK, LATOURETTE and WARNER, Justices.

LUSK, J.

This is an appeal by the plaintiffs from a judgment of involuntary nonsuit in an action of libel.

In November, 1946, the plaintiffs, John E. Marr and Robert B. Marr, brothers (who will hereinafter be referred to by their given names), were students at Willamette University in Salem, Marion County, Oregon. They were veterans of World War II, and as such receiving financial aid from the government for educational purposes under the legislation popularly known as the "G. I. Bill of Rights." To supplement their incomes so that they would be able to continue in school they undertook to engage in their spare time in the business of repairing radios. John had had some experience in that kind of work and owned some equipment. The brothers purchased additional equipment and a small stock of parts, and fitted up a room in the attic of John's house as a repair shop. In the latter part of November, 1946, they inserted in the two Salem daily newspapers, the Capital Journal and the Statesman, an advertisement reading as follows:

"GUARANTEED RADIO SERVICE, Free pick-up delivery. Ph. 9098."

The phone number 9098 was that of a service station in Salem leased from the Shell Oil Company by Edward A. Perrin, with whom the plaintiffs had made

an arrangement for its use in that manner, Mr. Perrin undertaking for an agreed compensation to accept calls from persons answering the advertisement and desiring the plaintiffs' pickup and repair service and to keep a record of their names, addresses and phone numbers. Robert, who had a car, would go to the service station after school hours for the purpose of finding out whether any orders had been received, and would pick up the radios of those phoning in orders and take them to John's house to be repaired. After John had made the repairs Robert would deliver the radios to the owners. It was also Robert's duty to make the collections and keep the books. The advertisement was first inserted in the papers on the 27th or 28th of November, 1946, and was published continuously thereafter until the end of December.

In the issue of the Capital Journal of December 4 there appeared the following article which is the basis of this action:

"SLICKERS WORK RADIO RACKET

"Established radio dealers and repair plants in the city are becoming alarmed over what appears to be a 'radio racket' which causes owners to lose their sets and much embarrassment upon the part of the dealer.

" 'The common practice of these slickers is not to operate from any established shop but just give a phone number to call and offer free pick-up service,' according to Ray Moore, 3720 Portland Road, who has had personal experience along this line.

" 'In most instances the name is not listed and since it is impractical to properly service most radios in the home, the set is taken away and that is the last the owner sees of his radio. In some cases the customers were told that the radios would be taken to some well-known or established shop and considerable ill-feeling has developed when

owners, not getting their radios delivered after sufficient lapse of time to make repairs or adjustments, have called at the shop they supposed the set was taken only to find that it was not there.'

"Moore suggests that the best curb on the racket is for the owners of radios to, whenever possible, take the set into the shop in person where, if necessary to leave the radio for any time, a proper receipt will be issued."

The defendant, George Putnam, is the owner and publisher of the Capital Journal, and his co-defendant, Ray Moore, who had a radio service business in Marion County, furnished the information which constituted the basis of the article to a reporter on the newspaper. Plaintiffs sued the defendants for libel, alleging that the article was published of and concerning the plaintiffs and that they were the only persons in the city of Salem engaged in the radio repair business who maintained a free pickup service and who advertised it in the manner described in the alleged libelous publication, and that the article had injured them "in their persons, reputations and business in the sum of $10,000 general damages and the sum of $10,000 punitive damages."

As stated by the trial judge in an oral opinion allowing the defendants' motion for a judgment of involuntary nonsuit, the motion was based upon three grounds: First, that there was no proof of the application of the article in question to the plaintiffs; second, that no damage was shown; and, third, that the article was privileged, and there was no malice, ill will, bad motive or recklessness on the part of the defendants. The judge held against the defendants on the first and second grounds, but was of the opinion that the publication was qualifiedly privileged and that the defendants had not abused the privilege, and that there was

no evidence of actual malice. He accordingly allowed the motion. In order to determine whether this ruling was correct, either for the reason given by the court below or for any other reason that has been urged in this court, it is necessary to summarize the evidence, bearing in mind the rule that we must view it in the light most favorable to the plaintiffs.

Plaintiffs commenced their radio repair business on or a little before November 21, 1946, which was the date of the collection of their charge for the first job. The first advertising was somewhat different from that which they used beginning about November 27, and which has been heretofore described. They also put out in various places a small poster advertising their business, but practically no orders were obtained through this source. Between November 21, 1946, and January 11, 1947, when the business came to an end, the plaintiffs received 17 orders in all. The source of nine of these was the telephone number at Perrin's service station. After the publication of the article only one phone call—which was not productive of an order—was received at the service station as a result of the plaintiffs' advertising, although, as has been stated, it was continued all through the month of December. In the eight days of November that the plaintiffs carried on their business their gross receipts were $69.50 and expense $27.38; for the whole of December, gross receipts were $90.82, expense $46.71; and in January gross receipts were $26.80, expense $14.85. No orders were received after the 11th of January, and, although they did not abandon their business at that time, "We just didn't get any more," as Robert testified.

The day after publication of the article the plaintiffs went to the office of the Capital Journal and

interviewed there a Mr. Logan, a reporter, who said he had written the article. They told Logan about their advertisement and asked him to publish an additional article stating who the plaintiffs were, that they were Willamette students who were doing this radio work in their home, that they did not have an established shop but were competent to do the work. Logan refused their request, saying that he could produce a letter written by Mr. Moore from which he got the substance of the article, and that he had grounds for writing it.

The plaintiffs also interviewed the chief of police of Salem, a deputy in the office of the county sheriff of Marion County, and someone in the state police, and ascertained that no complaints had been made to any of these officials of a radio racket such as is described in the publication.

Frank A. Minto, Salem's chief of police in December, 1946, testified that he could not recall that the plaintiffs had talked to him about the matter, though he thought that he (Minto) had discussed it with one of his subordinates. He did not remember that any complaints about a radio racket of the kind referred to had been made to him.

Lawrence Osterman, chief deputy district attorney at the time, did not recall such a conversation with the plaintiffs, but testified that no such complaints had been received or were on file in the district attorney's office.

Alma Malstrom, chief deputy sheriff of Marion County at the time, testified that she remembered a conversation with the plaintiffs concerning such complaints and that none had been made.

There was evidence that friends and acquaintances of the plaintiffs who read the article thought that it referred to the plaintiffs.

Mrs. Richard Mellum, who had known the plaintiffs about five years and knew about the work they were doing in November and December of 1946 and about their advertising, testified that, upon reading the article, she believed that it referred to the plaintiffs' "new business." On cross-examination she testified:

"Q  You saw in there the use of the expression 'Slicker' in the headline, did you?
"A  Yes, sir.
"Q  And you thought that that was intended to apply to the boys, did you?
"A  Yes, I thought it was probably a misinterpretation of what they were doing, as I said before, and I connected their ad with what this said, because as far as I could tell there were no other ads in the paper without any name or address on them.

\*   \*   \*   \*   \*

"Q  Just the one question, and I want an answer to that one, please:  Did you understand that that description of the so-called slickers who didn't operate from any established shop applied to the Marr brothers?
"A  I thought it might apply to them.
"Q  Notwithstanding the fact that you knew that they had a shop and were long time residents of Salem?
"A  Yes.
"Q  You did know that they were long time residents of Salem?
"A  Yes.
"Q  And responsible people from a responsible family?
"A  Yes.
"Q  And you knew that they had a shop.
"A  Yes.
"Q  And you thought it was a reference to the Marrs?
"A  Yes, unfairly.

"Q Did you notice the part of the article that referred to 'no established shop'?

"A Yes, I had noticed it."

Several other acquaintances and friends of the plaintiffs testified to the following effect: Dale M. Marsland, who was the proprietor of a market formerly operated by the father of the plaintiffs, when he first read the publication thought that it referred to them, and when they came into the store he asked them if they were the city slickers or radio slickers that were referred to in the paper.

R. J. Chance, a Willamette student, testified that when he read the article his first thought was that "the Marr boys or someone like the Marr boys were running a slicker racket, and since they were in that business I thought that it applied to them or anyone else in that business." He heard the article discussed in the presence of the plaintiffs and other people and said, "I think they were pretty severely ridiculed by friends. I think I was guilty of it, myself, razzing them about being slickers." He was asked on cross-examination whether the razzing was done in a serious way or jokingly, and answered, "Well, it seemed ridiculous to me—I thought it was at least that they were running a racket, and it seemed to apply to the way they were running their business, or so-called business; and I felt it was going to affect them, and, if it didn't, at least it looked like it was speaking about them."

H. R. Woodburn, Jr., a Willamette student with whom the boys had discussed the methods they were going to use in building up the business, thought that the article applied to the plaintiffs. He heard the matter discussed on the campus of the university, and, in answer to the question whether or not, in his pres-

ence and the presence of others, the plaintiffs were accused of the things stated in the article, he answered: "They were not—It is a little bit difficult to know just what the word 'accused' means. If you mean we thought they were slickers or crooks, naturally we didn't; but if you mean that we thought that the article meant slickers and crooks, we did. But they weren't accused of being slickers and crooks."

A. G. Hamilton, a building contractor, testified that he thought the article referred to the plaintiffs.

The plaintiffs also testified to statements made to them by friends and acquaintances concerning the article a day or two after its publication. One of their teachers, Professor Brown, at Willamette University, suggested that they were accused of being "slickers." Jerry Moore said to them, "It looked like we were out of business from that article, and more or less expressed the opinion that it had happened." Mr. and Mrs. Hamilton, neighbors of John, came to his home on Friday evening, two days after the publication, and asked John what the article had done to their business. Robert testified that some of his fellow students called him a "slicker" and "racketeer," and asked him when he was going to be thrown into jail. Two days after the article appeared he went to the grocery store where he traded, and the grocer, in the presence of several customers, spoke of the article to him.

John testified that he examined copies of the Capital Journal, the Statesman, and the Capital Press, another newspaper published in Salem, for the ten days immediately preceding the publication of the article and found no advertisement of radio repairmen other than the plaintiffs', which was in substance the same as that described in the article.

*Applicability of Article to Plaintiffs*

Section 1-908, OCLA, provides:

"In an action for libel or slander it shall not be necessary to state in the complaint any extrinsic facts for the purpose of showing the application to the plaintiff of the defamatory matter out of which the cause of action arose; but it shall be sufficient to state generally that the same was published or spoken concerning the plaintiff, and if such allegation be controverted, the plaintiff shall be bound to establish on trial that it was so published or spoken."

See *Cole v. Neustadter,* 22 Or 191, 199, 29 P 550.

Defendants, by their answer, denied the allegation of the amended complaint that the article was published "of and concerning the plaintiffs." Under the statute this denial cast upon the plaintiffs the burden of showing that the libel applied to them. This they undertook to do, not only by evidence that they were engaged in the radio repair business in Salem and advertised in the manner described in the article, but that they were the only persons who were so engaged and so advertised, and that at least ten of their friends and acquaintances, who knew about their business venture and their method of conducting it, at once thought that it was the plaintiffs who were the objects of the libel.

■ The question whether the article applied to the plaintiffs was one of fact. We quote from the authorities:

"Where the defamation complained of is ambiguous in respect of its application to the plaintiff —as where it omits his name or misnames or misdescribes him—most authorities hold that the matter must be submitted to the jury for determination.

On the other hand, it has been held that where the complaint contains no colloquium or other allegation tending to show that the matter was directed to the plaintiff, the ordinary and natural meaning of the language is a question of law to be decided by the court." 33 Am Jur, Libel and Slander, 279, § 295.

"Whether plaintiff was the person intended, where the defamatory matter does not show on its face that it refers to him, is a question for the jury, but if there is no ambiguity in the language used in connection with all the attendant circumstances it is a question of law. Where the designating or descriptive words in the publication are not equivocal, and there is no evidence from which it could be reasonably inferred that they were actually intended or understood to apply to plaintiff, the question is one of law, and the court may properly take the case from the jury or instruct them that the words did not apply to plaintiff." 53 CJS, Libel and Slander, 341, § 224.

See *State v. Mason,* 26 Or 273, 38 P 130, 26 LRA 779; *Ellis v. Brockton Pub. Co.,* 198 Mass 538, 84 NE 1018; *National Refining Co. v. Benzo Gas Motor Fuel Co.,* 20 F2d 763, 55 ALR 406; *Powell v. Young,* 151 Va 985, 144 SE 624 (reversed on other grounds, 151 Va 985, 145 SE 731); *Memphis Commercial Appeal v. Johnson,* 96 F2d 672; *Roth v. Greensboro News Co.,* 217 NC 13, 6 SE2d 882; *Jackson v. Consumer Publications, Inc.,* 256 AppDiv 708, 11 NYS2d 462; *Le Fanu v. Malcomson,* 1 HLC 637, 9 Eng Rep 910; *Mueller v. Radebaugh,* 79 Kan 306, 99 P 612; *Kilpatrick v. Edge,* 85 NJL 7, 88 A 839.

The rule is thus stated in 3 Restatement, Torts, § 564:

"A defamatory communication is made concerning the person to whom its recipient correctly, or

mistakenly but reasonably, understands it as intended to refer.''

We quote the following from Comment b to that section:

"If the communication is reasonably understood by the person to whom it is made as intended to refer to the plaintiff, it is immaterial that the defamer did not intend to refer to him. It is not enough, however, that the defamatory matter be actually understood as intended to refer to the plaintiff; such interpretation must be reasonable in the light of all the circumstances. It is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended."

The admissibility of evidence of witnesses, who read the publication and knew the plaintiff that they understood that it referred to him, is established in this jurisdiction by *State v. Mason,* supra. After observing that there is a conflict of authority on this question, the court, speaking through Mr. Chief Justice ROBERT S. BEAN, said:

" * * * But, on the other hand, it is held, and we think with the better reason, that when the words are ambiguous as to the person intended, and their application doubtful, persons who read the libel and are acquainted with the parties and the circumstances, may state their judgment and understanding as to whom the libelous charges referred [citing authorities]. The weight of authority undoubtedly supports this latter doctrine, and we understand defendant's counsel to admit this to be the rule in actions for damages, but he contends it should not prevail in criminal prosecutions. This question, it seems to us, is settled by the statute of this state, which provides that the law of evidence in civil and criminal actions shall be the same, except as otherwise provided in the Code (section 1364);

but whether it is or not, we have been unable to discover any difference between civil and criminal actions in the general rule governing the admission of evidence to show that the words were intended to be used in an actionable sense, and, when ambiguous, to whom they were intended to apply. In either case it is incumbent on the plaintiff or prosecution to show by proper averments and proof that the defendant intended to apply the words used to the plaintiff or person designated in the indictment as the subject of the libel; and evidence competent in the one case must necessarily be so in the other. The object and purpose to be attained by such evidence is the same in civil and criminal cases, and the reason and necessity for its admission applies with equal force to both classes of actions [citing authorities]. In this case the language of the libel, so far as the person referred to is concerned, is ambiguous, and its application doubtful; and therefore, under the rule we have stated, the evidence of the witnesses as to whom they understood it to refer was competent."

The foregoing language leaves no room for debate as to the applicability of this rule of evidence to civil cases. See, also, Odgers, op cit., p. 126.

The defendants argue that the article does not refer by name or otherwise to plaintiffs and that it cannot be made to do so by allegation or evidence. To support this proposition counsel quote from Odgers on Libel and Slander (6th ed), p. 123, as follows: "An innuendo cannot make the person certain which was incertain before." The sentence is part of Odgers' discussion under the heading "Certainty as to the Person defamed." The entire paragraph from which it is taken, together with the preceding paragraph, is as follows:

"The defamatory words must refer to some ascertained or ascertainable person, and that person

must be the plaintiff (see Syme v. Canavan, [1918] V. L. R. 540 (Aus.) ).

"If the words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory. 'An innuendo cannot make the person certain which was incertain before' (James v. Rutlech, 4 Co. Rep. 17 b). So if the words reflect impartially on either A or B, or on some one of a certain number or class, and there is nothing to show which one was meant, no one can sue. *Where the words reflect on each and every member of a certain number or class, each or all can sue.* 'Every member of the class who could satisfy the jury that he was a person aimed at and defamed could recover' (*per* Farwell, L. J., in Jones v. Hulton & Co., [1909] 2 K. B., at p. 481)." (Italics added.)

Again, at p. 125, the author says:

"Though the words used may at first sight appear only to apply to a class or number of persons, and not to be specially defamatory of any individual, still an action may be maintained by any particular member of that class or number who can satisfy the jury that the words referred solely or especially to himself."

Several pages are then devoted to illustrations from decided cases of application of this rule, and its corrollary that "The plaintiff is entitled to recover if he can show that the defamatory words were understood as referring to him by persons who knew him, or if the words are such that the world would apply them to the plaintiff." See, to the same effect, 3 Restatement, Torts, § 564, and Comment c thereunder.

It is said that the courts "are usually disinclined to allow a recovery if the group or class in question is a large one and the defamatory publication complained of has no particular application to the person who is

seeking relief." 33 Am Jur, Libel and Slander, 182, § 192. But, as stated in the foregoing section:

"* * * The situation is wholly different when it clearly appears that the alleged defamatory matter points to a particular member of the group or class involved; in such a case, the person so singled out is entitled to redress, and his right thereto is not affected by the circumstance that the language used may also apply to others. It also seems to be an established rule that when a defamatory publication is directed toward *a restricted subdivision of a particular class* or against a comparatively small group or association of persons, such as a jury, a family, a society, a board of public officers, or the engineers of a particular company, any individual member thereof can maintain an action against the defamer." (Italics added.)

See, to the same effect, 53 CJS, Libel and Slander, 55, § 11c; case note, 23 LRA NS 726; *Louisville Times v. Stivers,* 252 Ky 843, 68 SW2d 411, 97 ALR 277 with annotation at p. 281.

The case note in 23 LRA NS 726 has been more than once cited by the courts as authority. It distinguishes between the words "class" and "group." "'Class' is to be regarded in its most general sense, and as having reference to a large number of persons who may be designated collectively by a single name, irrespective of geographical limitation, political subdivision, place of abode, or any similar restriction." Professional men and public officers generally are said to belong to classes, while, if only those within a certain city are referred to, they may be said to form a "group." The distinction is recognized and approved in *Louisville Times v. Stivers,* supra. We quote further from the case note:

"The question here considered is, Admitting or conceding that the language used would be libelous

if it had been directed at the plaintiff personally, is it actionable when directed impersonally at a class or group to which he belongs? It may be said generally that, if the language is so used as unerringly to point to plaintiff, his right of action is not affected by the fact that it is also applicable to others; and, although the language may not on its face refer to the plaintiff, he may maintain his action if he can establish its application to himself.

"But if there is nothing in the language employed which, by proper inducement or colloquium, can be given personal application to the plaintiff, he has no right of action. * * *

"Keeping in mind the sense in which the word 'class' is used in this note, it may properly be said that an individual who is not named cannot maintain an action for the publication of matter in derogation of the class to which he belongs.

\* \* \* \* \*

"In this connection another distinction, in addition to that between class and group, should be kept in mind. If the defamatory matter is used toward the entire group,—that is, includes all of them,—it may generally be said to refer to each, so that each may sue. On the other hand, if the language is used indefinitely or impersonally toward one or a few of several members of a group, any member must establish its application to him in order to maintain his action."

The rule is thus stated in Newell, Slander and Libel (4th ed), 262, § 220:

"Where defamatory matter is published against a class or aggregate body of persons, an individual member not specially included or designated cannot maintain an action, for this, among other reasons that the body may act very corruptly or disgracefully, and yet the individual may have been in the minority and may have opposed measures alluded to; but where many individuals are severally included in the same attack, whether by the language

of the satirist or the pencil of the caricaturist, the plaintiff is none the less entitled to redress because others are injured by the same act. But the words must be capable of bearing such special application to plaintiff. There must be an averment in the statement of claim that the words were spoken of plaintiff, and plaintiff may also aver extraneous facts, if any, showing that he was the person expressly referred to.''

Leading cases involving defamation of a group are *Ryckman v. Delavan,* 25 Wend 186, in which the court held that a member of one of six firms engaged in brewing and malting in a certain locality could maintain libel for the publication of an article charging that they engaged in unwholesome and filthy practices in the process of malting where it was false and malicious; and *LeFanu v. Malcomson,* supra, where it was held that the proprietors of a factory in a certain county in southern Ireland could maintain an action for the publication of a libelous article calling attention to factory abuses in such county, stating that, in some factories in Ireland, tyranny, oppression, Sabbath-breaking, and extortion were practised, and that the author had one in mind in the south of Ireland, where the jury found that the article applied to the plaintiff's factory. In the later case Lord Campbell, answering the objection that because the libel applied to a class of persons an individual could not apply it to himself, used these frequently quoted words:

> ''Now, I am of opinion that that is contrary to all reason, and is not supported by any authority. It may well happen that the singular number is used; and where a class is described, it may very well be that the slander refers to a particular individual. That is a matter of which evidence is to be laid before the jury, and the jurors are to determine whether, when a class is referred to, the individual

who complains that the slander applied to him is, in point of fact, justified in making such complaint. That is clearly a reasonable principle, because whether a man is called by one name, or whether he is called by another, or whether he is described by a pretended description of a class to which he is known to belong, if those who look on, know well who is aimed at, the very same injury is inflicted, the very same thing is in fact done as would be done if his name and christian name were ten times repeated.''

See, also, *Lathrop v. Sundberg,* 55 Wash 144, 104 P 176.

On the other hand, as illustrative of what is termed a ''nonactionable class libel,'' attention is called to *Watts-Wagner Co., Inc. v. General Motors Corporation,* 64 F Supp (SDNY) 506, in which recovery was denied where the alleged libel contained a warning to the public and to battery dealers about an ''army of racketeers who are sweeping the country, taking advantage of the circumstances by selling the unwary car owner or battery dealer some fancy packaged flour, sand, Epsom Salts, or just any old white powder as a panacea for all battery troubles.'' Plaintiff alleged in his complaint that he was engaged in the manufacture, sale and distribution of a product designed to lengthen the useful life of electric storage batteries and increase their efficiency. Apart from this, there was no suggestion in the article that the plaintiff and his product were the objects of the words. The court said that a reading of the alleged libelous matter clearly indicates that it had a nationwide aspect and application, and that if it related to the plaintiff ''it was only by reason of extrinsic facts and circumstances and these are not pleaded''; and further that ''if it is not apparent from a fair reading of them that the statements concerned

the plaintiff, a cause of action may not be read into them by the claim that the plaintiff was the intended party, or by extending their meaning through innuendo."

Again, when slanderous words were used about one of a group of about 25, and there was nothing to show that they were specially directed to the plaintiff as an individual, recovery was denied. *Blaser v. Krattiger,* 99 Or 392, 195 P 359.

Cases relied on by the defendants in which the allegations of the complaint affirmatively excluded the plaintiff as the person libeled are not in point. Among these is *Fleischmann v. Bennett,* 87 NY 231, in which the plaintiff pleaded himself out of court by alleging that he was not in any manner a copartner, owner or agent in any business such as was described in the article, which referred solely to a business carried on by a certain firm and was directed wholly against that firm and its business. While no person was referred to in the article except members of the firm, the plaintiff expressly alleged that he was not a member of the firm and that he had no connection therewith. Similar cases are *Corr v. Sun Printing & Publishing Association,* 177 NY 131, 69 NE 288; *Dunlap v. Sundberg,* 55 Wash 609, 104 P 830, 133 Am St Rep 1050; and *Blaser v. Krattiger,* supra.

The defendants say that innuendo may serve to explain precedent matters but never to establish a new charge or enlarge or change the previous words, citing *Peck v. Coos Bay Publishing Co.,* 122 Or 408, 259 P 307, and *Cole v. Neustadter,* 22 Or 191, 29 P 550. This, of course, is true, and, if this were a case in which the plaintiffs had alleged facts in their complaint which showed that the article did not apply to them, or if the article itself were susceptible of such a mean-

ing, it would avail them nothing to allege, in the language of the statute, that the defamatory matter was published or spoken concerning them. See *Dunlap v. Sundberg* and *Fleischmann v. Bennett,* both supra. Innuendo, however, may be "properly used to point the meaning of the words alleged to have been spoken, in view of the occasion and circumstances, whether appearing in the words themselves, or extraneous prefatory matters alleged in the declaration." *McLaughlin v. Fisher,* 136 Ill 111, 116, 24 NE 60. "Such an innuendo does not extend the meaning of the defamatory matter; it only points out the particular individual to whom such matter does in fact apply. The decision of the jury on the point is practically conclusive." Odgers, op. cit., p. 125. Here the extraneous prefatory matter which justified the claim, so far as the complaint is concerned, that the words were printed of and concerning the plaintiffs, is the allegation that the plaintiffs were the only persons in the city of Salem engaged in the radio repair business who maintained a free pickup service and who advertised said service in the manner described in the article. And the proof tended to support that allegation.

■ The defamatory article here under consideration was, in the language of American Jurisprudence above quoted, "directed toward a restricted subdivision of a particular class," that is to say, toward every person in the city of Salem who carried on the business of repairing radios in the manner described in the publication; and, under the authorities cited, every member of the group, if there were more than one, as to whom the charges were false, would have a right of action against the defendants. And, on the evidence before us, the truth of which must be deemed conceded, the plaintiffs were the only persons in the city of Salem to

whom the article was applicable. The evidence would justify a finding that it not only hit the plaintiffs but was aimed directly at them.

■■ In view of the attempt to dilute the evidence of the plaintiff, John Marr, that the plaintiffs were the only radio repairmen in Salem who advertised in the manner described in the article, by referring to Robert's testimony to the effect that he did not know whether this was so or not, we find it necessary to call attention again to the fact that we are dealing with a motion for a judgment of involuntary nonsuit, and to reiterate the familiar rule that, in considering such a motion, plaintiffs' evidence is deemed to be true, and every inference of fact that can be reasonably and legitimately drawn therefrom shall be given effect; and the evidence must be interpreted in the light most favorable to plaintiffs. *Bradford v. Bradford,* 165 Or 297, 303, 304, 107 P2d 106. Unless, therefore, we are to ignore a rule of procedure that is as firmly established as anything in the law—a rule, we assume, which no lawyer would question for a moment—it is our duty to accept as true John's testimony upon this point and to give to Robert's no weight or consideration whatever.

Defendants' counsel argue, however, that the words could not be reasonably understood as applicable to the plaintiffs because they had "an established shop." They say in their brief that the article "merely cautioned the public to beware of the fly-by-night person having no established shop, as distinguished from appellants who were long-time residents of Salem and who did have an established shop." Of course, the article does not mention fly-by-night persons, and it contains no language which would exclude long-time residents of Salem.

■ We are to read the article as a whole in order to determine the sense in which particular words were used. *Boehmer v. Detroit Free Press Co.*, 94 Mich 7, 10, 53 NW 822, 34 Am St Rep 318. Its opening sentence is, "Established radio dealers and repair plants in the city are becoming alarmed over what appears to be a 'radio racket' ", etc. The article proceeds: "The common practice of these slickers is not to operate from any established shop but just give a phone number of call and offer free pick-up service". "In most instances," it is said, "the name is not listed * * * In some cases the customers were told that the radios would be taken to some well-known or established shop and considerable ill-feeling has developed", etc.

■ It will be observed that the word "established" is used three times, and it may reasonably be understood to have the same meaning throughout. It once modifies "radio dealers and repair plants" (meaning, we take it, the owners of such plants because a repair plant could not become alarmed), and twice modifies "shop". In its final use it is treated apparently as a synonym of "well-known." One definition of "established" is "made stable or firm": Websters New International Dictionary (2d ed). "Establish" means "settle securely, as in a business": Funk & Wagnall's New Standard Dictionary; "to set up on a secure or permanent basis": The Oxford English Dictionary.

We are of the opinion that the phrase "established shop", in the context of the article and interpreted with reference to the circumstances of the plaintiffs, is not of any certain meaning. The distinction that the article appears to endeavor to bring home to readers of the paper is one between persons engaged in the business of dealing in and repairing radios, who conducted their business in the conventional manner and

had become established in the business life of the community and those who, like the plaintiffs, advertised in the manner described and were not so established.

Had the article used the word "shop" without the qualifying adjective there might be merit in the defendants' contention, for, while the plaintiffs undoubtedly had a shop, the question is whether they "operated" from an *established* shop. They were students in college, endeavoring to add something to their incomes from the government by a small part-time business of radio repairing, done in a shop fitted out in the attic of the home of one of them. This business was not carried on in the name of anyone so far as the general public were concerned. It had been in existence for only two weeks prior to December 4, 1946, and during that time its gross receipts were about $125.00. It had no telephone listing, and, so far as appears, no customers were solicited to come to this shop for the transaction of business. Plaintiffs' friends and acquaintances who read the article might readily conclude that this shop was not stable or firm or set up on a secure or permanent basis, and that their precarious business venture was not an "established shop" in the sense of the article. Assuming that the words might be susceptible of the meaning attributed to them by the defendants, "the matter then presents a question for the jury to decide, *i. e.,* whether the one meaning or the other was in fact conveyed to the readers of the publication." *Kilpatrick v. Edge,* supra, 85 NJL at p. 9.

▮ The fact, as stated in the defendants' brief, that "there was no evidence which indicated that respondents were acquainted with appellants, or had ever heard of them" is immaterial. The question "is not

who was aimed at, but who was hit." *Laudati v. Stea,* 44 RI 303, 117 A 422.

"If the defendant's words have in fact injured the plaintiff's reputation, it is no defense to an action that the defendant intended them to refer to some one else. He should have been more explicit; his secret intention is immaterial. The plaintiff is entitled to recover if he can show that the defamatory words were understood as referring to him by persons who knew him, or if the words are such that the world would apply them to the plaintiff.

\* \* \*

" 'Just as the defendant could not excuse himself from malice by proving that he wrote it in the most benevolent spirit, so he cannot show that the libel was not of and concerning the plaintiff by proving that he never heard of the plaintiff. His intention in both respects equally is inferred from what he did. His remedy is to abstain from defamatory words' (*per* Lord Loreburn, L.C., *ib.,* [1910] A.C., at pp. 23, 24." Odgers, op. cit., 128, 129.

See, also, *DeLashmitt v. Journal Publishing Co.,* 166 Or 650, 114 P2d 1018, 135 ALR 1175; 3 Restatement, Torts, § 564, Comment b.

We conclude that persons with a knowledge of the circumstances could reasonably have understood upon reading the article that it referred to the plaintiffs and the question whether it did in fact refer to them was for the jury.

*Damages*

We find no argument in defendants' brief in support of the claim that there is no evidence of damage to the plaintiffs other than the following statement: "The evidence showed that after one of appellants had resumed the radio repair business under his own name,

his business was 'all right'. It is apparent from appellants' evidence, generally, that publication of the article occasioned no damage to appellants or their business." Inasmuch as the evidence shows that after publication of the article not a single order was received by plaintiffs over the Shell service station telephone, it can hardly be said that this view of the case is supported by the record. The jury would certainly have been justified in finding that this decline of business was the consequence of the libel and not a mere coincidence.

But, quite apart from this evidence of actual loss, if the article was libelous per se, damages will be presumed as a consequence of its publication. *Peck v. Coos Bay Times Publishing Co.*, supra, 122 Or 418; Newell, op. cit., 843, § 756; 53 CJS, Libel and Slander, 378, § 262.

The article accused the persons to whom it referred of being "slickers" and of working a "radio racket." A "racket" is "A dodge or trick; a fraudulent scheme, game, or the like": Webster's New International Dictionary (2d ed). See *Kinsley v. Herald & Globe Association*, 113 Vt 272, 34 A2d 99, 148 ALR 1164. A "slicker" is "A slick person; a clever trickster or cheat." Id. The racket or fraudulent scheme is described in the article as the gaining possession of radios by the slickers under the pretense of undertaking to repair them and then failing to return them to the owners.

Whether an article is libelous per se is a matter of law for the court to determine. *Peck v. Coos Bay Times Publishing Co.*, supra, 122 Or 418, and cases cited; *Kilgore v. Koen*, 133 Or 1, 9, 288 P 192. In the Coos Bay Times case this court approved the following

definition of libels actionable per se taken from 36 CJ, Libel and Slander, 1164, § 28:

> " * * * defamatory words to be libelous *per se* must be of such a nature that the court can presume as a matter of law that they will tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided."

See, also, *Reiman v. Pacific Development Society*, 132 Or 82, 88, 284 P 575.

■ In the Coos Bay Times case we held it libelous per se to charge a man with being a "double-crosser." There can be no doubt that the words here complained of are equally objectionable.

Something has been sought to be made of the fact that as the evidence indicates, the high esteem in which the plaintiffs were held by their friends was not altered by the publication. This is a strange argument. Its acceptance would sanction a new principle in the law of libel, under which the spotless character and unassailable reputation of the person wrongly accused would afford immunity to his defamer.

*Qualified Privilege*

By their answer the defendants admitted the allegations of the amended complaint that the plaintiffs were not slickers and had not committed any of the dishonest or fraudulent acts charged in the article, at the same time that they denied that the article was intended to or did apply to the plaintiffs. Affirmatively the defendants pleaded what is claimed to be a qualified privilege as follows:

"IV

"At the time of such publication of said article, it was a matter of honest and sincere belief, reason-

ably founded, of and among persons engaged, or interested, in the radio service business in said state that unscrupulous, as well as scrupulous, persons had been, and were, engaged in the practice of soliciting, in the United States, radio service business by advertising so-called 'pick-up and delivery service,' or similarly, calculated to result, and resulting, in their being enabled to take and remove radios from the possession of the respective owners thereof for the purpose of repair and servicing. Whereas such scrupulous class of persons so engaged in such practice, after having so obtained possession of radios from the respective owners, thereof, repaired or serviced such radios and thereafter returned such radios to such respective owners, such unscrupulous class of persons, likewise ostensibly engaged in the same practice, but actually engaged in the practice of permanently depriving such owners of further possession of such radios, obtained possession of radios by the means aforesaid and failed to return them to the owners thereof, and, on the contrary, retained or disposed of such radios to their own profit· and advantage, and to the loss and damage of such owners. So believing, as aforesaid, of the existence of such practice on the part of such unscrupulous persons, defendants, in fulfilling their moral, civic and social duties to society and the public at large, in good faith, and without malice, and without intent or purpose to injure or defame plaintiffs, or either of them, and without therein, or otherwise, referring to plaintiffs, or either of them, and in honest, sincere and reasonably-founded belief of the truth thereof, caused said article to be published in said Capital Journal as a warning to innocent and uninformed owners of radios who would, or might, if not so warned, suffer loss and damage in the manner hereinabove mentioned.

## "V

" All matters and things appearing in said article were, upon such publication thereof, true and accu-

rate in substance and in fact, and such publication of said article was privileged and justified by the occasion and circumstances aforesaid, not only in the interest of the public at large, but also in the interests of all reputable persons, including said defendant Moore, engaged in the radio service business who theretofore had been, and then were, suffering inconvenience, annoyance and damage as a result of such practice engaged in by such unscrupulous persons''.

Defendants attempt to support the foregoing defense by the following proposition:

"Matters of public interest and concern are legitimate subjects of criticism, and everyone has a right to comment thereon as long as he does so fairly and with an honest purpose. Such comments or criticism are not libelous, however severe in their terms, unless they are made maliciously.''

They cite 33 Am Jur, Libel and Slander, 155, § 161; *Peck v. Coos Bay Times Publishing Co.,* supra; and *Kilgore v. Koen,* supra.

As the cited section in American Jurisprudence states, many cases consider the right to comment on matters of public interest an application of the general principle of the technical qualified privilege, while others treat them as different principles. It is perhaps not important here to dwell upon that subject, but there is one distinction (assuming for the moment that the rule concerning comments on matters of public interest is applicable to this case) which cannot be ignored. It is thus stated in Odgers, op. cit., 162:

"* * * the distinction cannot be too clearly borne in mind between comment or criticism and allegations of fact, such as that disgraceful acts have been committed or discreditable language used. It is one thing to comment upon or criticise, even

with severity, the acknowledged or proved acts of a public man, and quite another to assert that he has been guilty of particular acts of misconduct."

The Coos Bay Times case illustrates the application of the foregoing rule. While the plaintiff was not a candidate for a public office and did not occupy a public position, yet, because he was a leader in political activities and therefore invited more or less criticism from those who were not his supporters, it was held that the newspaper had the right to make fair comment and criticism upon plaintiff's alleged unreliability in political matters affecting the public interest. "When a man enters the political arena", it was said by Mr. Justice BELT, speaking for the court, "even though not a candidate, he must not be too sensitive about criticism. There are generally blows to receive as well as to give. While a newspaper, under the guise of qualified privilege, has no right to defame a person or to injure that which is his most valuable property right— a good name, it is no longer, in reference to matters of public interest, obliged to speak with bated breath." (122 Or 420, 421.) But it was held that the defense of qualified privilege or fair comment availed nothing relative to the charges that plaintiff committed a premeditated and vicious assault and that he was a double-crosser. As to these matters the court said: "Privilege ends where defamation begins. Relative to charge of commission of crime, truth was the only defense."

The decision is squarely against the defendants and is in accord with the weight of authority. See *Upton v. Hume,* 24 Or 420, 33 P 810, 21 LRA 493; *Burt v. Advertiser Newspaper Co.,* 154 Mass 238, 28 NE 1, 13 LRA 97 (per Holmes, J.); *Washington Times Co. v. Bonner,* 66 App DC 280, 86 F2d 836, 110 ALR 393, with extensive annotation beginning at p. 412.

*Kilgore v. Koen,* supra, the only other case cited by the defendants, does not involve a fair comment but the technical qualified privilege. The article claimed to be libelous was the newspaper account of the arrest of the plaintiff on a charge of theft and of the evidence relied on by the officers to secure his conviction. The publication was held to be privileged under the rule that a full, fair and impartial report of judicial proceedings is qualifiedly privileged even though the report contains matters that would otherwise be defamatory and actionable. No action will lie for making such a report except on proof of malice. The case is, of course, without any direct bearing here, while, under the Coos Bay Times decision, since the article now in question contains defamatory statements of fact, concededly not true of the plaintiffs, the defense of qualified privilege is not available to the defendants.

■ Apart from this, there is nothing in the record before us to justify a court in holding that the subject-matter of the article was of ''public interest'', within the meaning of the rule of qualified privilege. See 33 Am Jur, Libel and Slander, 161, § 167; Ann Cas 1917B 424–426.

■■ It is well to bear in mind that the publisher of a newspaper possesses no immunity from liability on account of a libelous publication not belonging to any other citizen. In either case the publisher is subject to the law of the land, and, when the publication is false and defamatory, he must answer in damages to the injured party. *Kilgore v. Koen* and *Upton v. Hume,* supra. It is no defense to defamation to say that the defendant believed the charges to be true. No matter how honest his motive, a journalist has no right to proclaim to the world that a particular individual is a thief or a murderer or that he has committed any

other crime in the catalogue of crimes. The only thing that can justify that is that it is true. *Upton v. Hume,* supra, 24 Or 433. So, also, of the plea that the defendants acted bona fide in the discharge of what they believed to be their duty. *Smart v. Blanchard,* 42 NH 137, 151. It is true of newspapers as of others, including business competitors such as the defendant Moore, that "One may not go about in the community and acting upon mere rumors proclaim to everybody the supposed frailties or bad character of his neighbor, however firmly he may believe such rumors, and be convinced that he owed a social duty to give them currency, that the victim of them may be avoided". *Byam v. Collins,* 111 NY 143, 19 NE 75, 2 LRA 129; 33 Am Jur, Libel and Slander, 127, § 127. See, also, *Foster v. Scripps,* 39 Mich 376, 380, 33 Am Rep 403; *Detroit Daily Post Co. v. McArthur,* 16 Mich 447, 451; *Perret v. New Orleans Times Newspaper,* 76 La 170, 177; *Usher v. Severance,* 20 Me 9; *Mallory v. Pioneer-Press Co.,* 34 Minn 521, 522, 26 NW 904; *McDonald v. The Sydney Post Publishing Co.,* 39 NSR 81; Newell, op. cit., 554, § 505.

We think there is no substance in the claim of qualified privilege in this case and that, for this reason and the other reasons stated, it was error to grant the motion for an involuntary nonsuit.

*Sufficiency of the Amended Complaint*

It has been suggested, however, that this action must be stopped because the plaintiffs are improperly joined. No challenge of this kind has been made by counsel for the defendants at any stage of the proceedings from the filing of the initial complaint until now. But it is said that the amended complaint, on which the case was tried, was fatally defective because it

does not show a joint injury to the plaintiffs, and that this is a question which the court will notice of its own motion. We are told further that a general demurrer filed by the defendants to the amended complaint was appropriate to raise the question of misjoinder, and therefore that the amended complaint is to be construed most strongly against the pleader.

■ While it is well settled that when words are spoken of two or more persons they cannot join in an action for the words because the wrong done to one is no wrong to the other, a well recognized exception to this rule is where defamatory words are published of partners in the way of their business. Newell, op. cit., 343, § 307; Odgers, op. cit., 475; *LeFanu v. Malcomson,* supra; *Weitershausen v. Croatian Printing & Publishing Co.,* 151 F 947; *Wright v. Afro-American Co.,* 152 Md 587, 137 A 273, 52 ALR 908, with annotation at p. 912 in which numerous cases supporting the exception are digested.

■■ The evidence as to the relationship between the plaintiffs discloses that they were partners in the radio repair business. This evidence came in without objection and was clearly admissible under the allegations of the amended complaint. That pleading showed a joint interest of the plaintiffs in the subject matter of the action and a joint injury for which they were entitled on proper proof to recover a joint judgment. To maintain such an action it was not essential that the plaintiffs allege a partnership. It was enough that they stated facts from which it appeared that they were jointly interested. It is immaterial that they could not recover a joint judgment for injury to their reputations, for, if the publication affects the plaintiffs in their joint capacity, they may sue jointly. 53 CJS

243, § 159; 37 CJ, Libel and Slander, 19, § 321. If a complaint states grounds for any kind of joint relief a demurrer for misjoinder of parties plaintiff cannot be sustained. 1 Bancroft's Code Pleading, Practice and Remedies (10 Year Supp) 111, § 204; *Speyer v. School Dist.*, 82 Colo 534, 261 P 859, 57 ALR 203. So, it was said by Judge Hough in *Weitershausen v. Croatian Printing & Publishing Co.*, supra:

> "It results, therefore, that all persons injured by libel or slander, and having a community of interest as to the subject-matter of defamation, may sue either jointly or severally, and, if the matter complained of be libelous per se, it is no more necessary to allege special damage in the joint action than it is in the several suits."

The amended complaint alleged:

> "That at all times herein mentioned plaintiffs were engaged in the radio repair business in the city of Salem, Marion County, Oregon, and in connection with said business maintained a free pick-up service and advertised said service in the daily papers of the city of Salem, Marion County, Oregon, in the following language: 'GUARANTEED RADIO SERVICE, Free pick-up delivery. Ph. 9098.'"

It was further alleged that at the time of the publication of the article complained of plaintiffs "were the only persons in the city of Salem, Oregon, engaged in the radio repair business who so maintained a free pick-up service and who so advertised said service," and that "said publication has injured plaintiffs in their persons, reputations *and business* in the sum of $10,000 general damages" (italics added). Reading all of these allegations together, it is clear that the plaintiffs were jointly engaged in the described business. They alleged that they were damaged in *their* business

—not that each of them was damaged in a separate business individually owned.

■ We hold that the amended complaint states sufficient facts to show a joint right of action in the plaintiffs for libelous words published of them in the way of their business; and that, even though it be proper to challenge a misjoinder of parties plaintiff by general demurrer, the amended complaint was not vulnerable to such an attack.

The plaintiffs (assuming that the jury should find that they are referred to by the article) are charged with dishonesty in conducting the firm's business, and "if the matter complained of be libelous per se it is no more necessary to allege special damage in the joint action than it is in the separate suits." Newell, op. cit., 361, § 324. In Odgers, op. cit., 317, it is said:

> "Again, where words are spoken of the plaintiff in the way of his profession or trade, so as to be actionable *per se,* the plaintiff may allege and prove a general diminution of profits or decline of trade, without naming particular customers or proving why they have ceased to deal with him * * * . The law already presumes that the plaintiff is injured in his business by the defendant's words; evidence as to the nature of the plaintiff's business before and after publication is admissible to show the extent of such injury."

See, to the same effect, *Wayne Works v. Hicks Body Co.,* 115 Ind App 10, 55 NE2d 382; *Sternberg Mfg. Co. v. Miller & Peters Mfg. Co.,* 170 F 298, 18 Ann Cas 69; cases cited in the dissenting opinion in *National Refining Co. v. Benzo Gas Motor Fuel Co.,* supra; 53 CJS, Libel and Slander, 365, § 242. In *Sternberg Mfg. Co. v. Miller & Peters Mfg. Co.* the court said:

> "It is a charge, too, of that peculiar misconduct which naturally and directly brings down upon the

offender's business the disapprobation of the public and necessarily entails injurious consequences. It is, therefore, according to well recognized law, actionable per se [citing cases]. Being so actionable, damages ensued as a necessary consequence; and it was not necessary to plead special damages to constitute a cause of action.''

■ In this connection notice will be taken of an objection that the article here in question is not libelous per se because it does not name the plaintiffs, thus requiring extrinsic evidence to show its application to the plaintiffs, and, therefore, that special damages must be alleged and proved. A similar contention was sufficiently answered by the United States Circuit Court of Appeals for the 8th Circuit in *National Refining Co. v. Benzo Gas Motor Fuel Co.*, supra, which was an action for libel of the plaintiff's product by the distribution of leaflets which did not mention the plaintiff or its product. The court said:

"We think there is no merit in the first contention. It is not necessary that the party libelled should be named in the libelous article. Whether an article is of a libelous character per se, and whether it has application to a particular party plaintiff, are entirely distinct questions, and should not be confused. The answer to the first question is to be found in the article itself. The answer to the second question is to be found in the proofs supporting proper allegations in the complaint. Those proofs may consist either of the article itself, or of extrinsic evidence.''

■ As stated, the plaintiffs, who were partners in the radio repair business, alleged that the publication complained of had injured them "in their persons, reputations and business in the sum of $10,000". They were charged with "that peculiar misconduct which

naturally and directly brings down upon the offender's business the disapprobation of the public and necessarily entails injurious consequences.'' Under the authorities above cited they were entitled to maintain this joint action for damages to them in the way of their business, and it was unnecessary for them to plead special damages.

We conclude that the motion for judgment of nonsuit should have been denied and the defendants required to go forward with the evidence. The effect of such a decision, it is perhaps needless to state, is not to ''recognize liability''; it means merely that the plaintiffs have made out a case sufficient to be submitted to a jury. The question of liability will be for the jury to determine after a trial on the merits.

Plaintiffs' brief contains an assignment of error based on the court's rulings on the voir dire denying plaintiffs' challenges to six prospective jurors. As the jury was not given an opportunity to pass on the case, the question raised is purely academic and we must, therefore, decline to rule upon it.

The judgment is reversed and the cause remanded for further proceedings in conformity to this opinion.

ROSSMAN, J., dissenting.

It is incomprehensible to me that a newspaper, which, in an effort to serve the public, publishes a warning which carefully avoids describing anyone, can be held liable to suit for libel for having made the publication. In this case, the sums sought are $10,000 compensatory and $10,000 punitive damages. The prevailing opinion recognizes a liability, even though some of the persons upon whom the plaintiffs relied deemed the purported application of the article to the plaintiffs as a joke, and others, whose testimony is said to

support the action, merely feared that the plaintiffs' advertising would no longer draw business for them through popular distrust of blind advertising; that is, advertising which gave no clue whatever to the identity of the advertiser. Obviously, the plaintiffs were not defamed in the minds of people who were ignorant of their existence and who, after reading the article, refrained from telephoning to "Ph. 9098". If one, however honest he may be, adopts a method of advertising which is similar to that employed by unscrupulous individuals, surely he is not defamed if a newspaper, without mentioning him, gives warning against the unscrupulous.

I said that the publication described none of those against whom it gave warning. Following is the article:

### "SLICKERS WORK RADIO RACKET

"Established radio dealers and repair plants in the city are becoming alarmed over what appears to be a 'radio racket' which causes owners to lose their sets and much embarrassment upon the part of the dealer.

" 'The common practice of these slickers is not to operate from any established shop but just give a phone number to call and offer free pick-up service,' according to Ray Moore, 3720 Portland Road, who has had personal experience along this line.

"In most instances the name is not listed and since it is impractical to properly service most radios in the home, the set is taken away and that is the last the owner sees of his radio. In some cases the customers were told that the radios would be taken to some well-known or established shop and considerable ill-feeling has developed when owners, not getting their radios delivered after sufficient lapse of time to make repairs or adjustments, have called at the shop they supposed the set was taken only to find it was not there.'

"Moore suggests that the best curb on the racket is for the owners of radios to, whenever possible, take the set into the shop in person where, if necessary to leave the radio for any time, a proper receipt will be issued."

Plainly, the publication of the article caused the prudent to refrain from answering advertisements such as the plaintiffs' which gave neither the name nor the address of the advertiser; but that fact does not indicate that the plaintiffs were defamed. A person who, after reading the article, declined to answer blind advertisements may have thought neither good nor bad about the advertiser. The article merely caused him to wait until he gained information about the advertiser.

From the foregoing it is apparent that because the defendants published a timely warning, which neither described nor mentioned anyone, the majority recognizes liability in them to the plaintiffs. The latter, the majority hold, proved that they were defamed by presenting evidence that (1) some friends feared that strangers to the plaintiffs might apply the article to them; (2) friends were apprehensive lest the article would cause people to abstain from answering blind advertisements and thus destroy the drawing power of such advertising; and (3) after the appearance of the article, the plaintiffs' advertisement yielded no results.

Obviously, the plaintiffs were not defamed in the estimation of strangers who were ignorant of their existence and who, after reading the article, thought it best not to respond to blind advertisements. The majority seem to believe that evidence showing that people who read the article and declined thereafter to telephone to "Ph. 9098" proves that the plaintiffs

were defamed. Those persons may have had no knowledge whatever of the plaintiffs. "Ph. 9098" was not the telephone number of either plaintiff. The article possibly left no impression in the minds of its readers except one which suggested that they be cautious. Suppose that I had a disabled radio set and, after reading the article and the plaintiffs' blind advertisement, took my instrument to a repairman whose advertising included his name, would my withholding of patronage from "Ph. 9098" prove that the advertiser, whoever he might be, had been defamed? The idea is preposterous.

I said that some of the plaintiffs' witnesses referred in terms of jest to the article's purported application to the plaintiffs. Let us now give that evidence brief attention. It will be recalled that the majority say: "One of their teachers, Professor Brown, at Willamette University, suggested that they [the plaintiffs] were accused of being 'slickers' ". Professor Brown did not testify. The sole reference to him was made by the plaintiff, John E. Marr. After he had sworn that Professor Brown used the word "slicker", he was asked: "What did he say?" and answered: "Just jokingly, I would say, because you know his character." It is not amiss to add that the record does not indicate whether Professor Brown had ever seen the article. John testified: "Whether these people actually read the article or not, I don't know." An yet it is testimony of that kind which the majority cite in support of their holding.

Robert swore that after the article appeared some of the students applied the term "slicker" to him and even mentioned "jail". Those who indulged in the remarks were friends who had been in his home. In reply to the question "Did they say that seriously

or jokingly?" he answered: "Well, I wouldn't say which" but shortly added, "so far as the jail thing was concerned, that was said to me jokingly." According to him, all who engaged in the remarks, which clearly were nothing but banter, remained his friends and made no change in their relationship to him. R. J. Chance, one of the students to whom the plaintiff Robert referred in the testimony of which I just took notice, used the word "razzing" in describing the manner in which he applied the article to the plaintiffs.

H. R. Woodburn, another of the students, testified: "If you mean we thought they were slickers or crooks, naturally we didn't, but if you mean that we thought that the article meant slickers and crooks, we did. But they weren't accused of being slickers and crooks." He added, "They were never accused of being slickers and crooks" by any student following the appearance of the article.

The plaintiff, John Marr, was asked: "Did anybody, as a matter of fact, indicate a belief to you that you were in fact a slicker in the radio business?" He answered, "To me? No."

The prevailing opinion says: "at least ten of their friends and acquaintances, who knew about their business venture and their method of conducting it, at once thought that it was the plaintiffs who were the objects of the libel." I am not certain of the manner in which the majority compiled its total of ten. Thirteen witnesses testified. Two of the thirteen were the defendants who, under examination by plaintiffs' counsel, disclosed their financial worth; two more were the plaintiffs themselves, and three of the thirteen were the local chief of police, a deputy sheriff and a deputy district attorney. Those three went no further

than to indicate whether or not they had received complaints concerning the loss of radio instruments. I have now accounted for seven of the thirteen witnesses and we have six left. One of the remaining six was Perrin, the operator of the filling station who permitted the plaintiffs to use his telephone. His testimony was concerned only with the agreement under which his telephone was used. Thus we have left Chance, Hamilton, Woodburn, Marsland and Mrs. Melum, all of whom are mentioned in this or the majority opinion. Evidently the majority include in its total of ten Professor Brown, whom I have mentioned, and an individual by the name of Jerry Moore who, according to one of the plaintiffs, told him "it looked like we were out of business from that article, and more or less expressed the opinion that it had happened." I have now accounted for every individual who was mentioned by name during the trial with the exception of Mrs. Hamilton. The latter, however, did not testify and no one indicated her views. Robert, after referring to Chance and Woodburn, added, "There were more." Evidently the majority, in addition to including both Brown and Moore in their total of "at least ten" include also not less than three of the "more". It is evidently in that way that the majority feel justified in saying that the plaintiffs presented evidence showing that "at least ten of their friends and acquaintances, who knew about their business venture and their method of conducting it, at once thought that it was the plaintiffs who were the objects of the libel."

Let us retrace our steps for a moment. When one reduces the list of "at least ten of their friends and acquaintances" to persons about whom we have ade-

quate information, only four are left. One of the four, as we have seen, went no further than to say "I thought it might apply to them" and another of the four termed his application of the word "slicker" to Robert as "razzing". Still another gave this evidence:

"Q Not knowing the Marr boys, how would it apply to them?

"A Well, not knowing them, but if their ad read every pick-up and delivery, if people read the ad, if it were their practice, or anyone else's practice, if I were not acquainted with the number, I wouldn't call anyone. And I think anyone advertising that way would suffer."

Others gave similar testimony. It was in the way just indicated that an effort was made to render the article applicable to the plaintiff—that is, to their advertising, not to them individually. Their friends feared that the article would destroy the drawing power of their advertisements. But, if people refrain from telephoning to "Ph. 9098", am I defamed if it develops that I am the one who inserted the advertisement in the paper? Possibly everyone who hesitated to telephone to "Ph. 9098" would have entrusted their radio sets to the plaintiffs had they known the plaintiffs' names or the location of their shop.

The fundamental issue in this case is this: When evidence of the kind just reviewed is presented as support for an averment that the plaintiffs were the persons purportedly described in an article such as the one before us, must the court submit the contention to the jury? My answer is no. Hundreds of similar situations evidently arise every month and, hence, I say that the issue just stated is fundamental. I will presently state the issue more clearly.

Reverting to the published article, it will be observed that it is nothing but a warning to the owners

of radio sets that unscrupulous persons were operating a racket whereby they gained, through false pretenses, the instruments of trusting householders. The article did not even say that the racket had entered Salem. Its purpose, obviously, was to caution persons against entrusting their instruments to strangers. It made no attempt to describe any person, and its references to the practices of the unscrupulous were guarded by such terms as "what appears to be", "the common practice", "in most instances" and "in some cases". Anyone who read the article at once realized that it described no one, and that its author was unable to delineate accurately the practices of the "slickers". Therefore, those who read the article knew that the guarded, general terms which it employed would not enable him to detect the identity of the unscrupulous.

One often encounters warnings. Almost everyone has given one. Not infrequently the President of our country gives warnings against political, economic and social practices which he deems inimical to the general welfare. Trade associations, such as the Better Business Bureau, publish warnings and thereby save people from losses which they would otherwise suffer. Lodges, through their fraternal publications, frequently give warnings and thereby protect their members from imposition. In our state, where the initiative and referendum are employed, proponents and opponents of measures many times issue warnings so as to prevent deception by those who are circulating the needed petitions. Everyone can recall reading in the daily press warnings about counterfeit money which has made its appearance. Normally, the warnings do not attempt to describe anyone. As in the present instance, they allude to the practices of the imposters and the evil wrought thereby.

If liability can be as easily established against one who has given a warning as the majority permit in this case, then the matter of issuing a warning will be more precarious than the nefarious acts of the persons against whose predatory conduct the public needs an alarm. For if all that is necessary is the testimony of friends who mentioned the matter by way of "razzing" or "just jokingly" or who thought "it might" apply to the plaintiffs, plus evidence that blind advertisements no longer drew business, who will have the temerity to give warnings?

The manner in which the plaintiffs contend that they were identified in the article as the persons against whom it was purportedly aimed and, therefore, as the persons whom it supposedly defamed, is averred in their complaint as follows:

"At the time of the publication of the article which is hereinafter described and for some time prior thereto plaintiffs were the only persons in the city of Salem, Oregon, engaged in the radio repair business who so maintained a free pick-up service and who so advertised said service."

The complaint does not allege that the plaintiffs were the only advertisers who identified themselves through the use in their advertisements of only a telephone number, and, as we all know, every issue of city newspapers contains many advertisements which omit the advertiser's name and give only his telephone number. Thus it is seen that the plaintiffs, after describing themselves in their complaint as "the only persons in the city of Salem, Oregon, engaged in the radio repair business who so maintained a free pick-up service and who so advertised said service", claimed that people who read the article at once thought that

they [the plaintiffs] were slickers and operators of a radio racket. The complaint does not allege that anyone knew that the advertisement which appeared daily, and which identified the advertiser only by the number "Ph. 9098", had been inserted by the plaintiffs and that it was their advertisement. Nor does the complaint allege that anyone except the plaintiffs knew that they were conducting an advertising campaign wherein they employed a telephone number only. Unless someone who read the article knew that the advertisement which employed the designation "Ph. 9098" was the plaintiffs', he surely would not have applied the article to them.

I do not believe that the purpose of § 1-908, OCLA, which the prevailing opinion quotes, was intended to dispense with the necessity of averring a fact of the kind just mentioned and which is absent from the complaint. If material facts can be safely omitted from the complaint, then the plaintiffs could, with equal reason, have omitted from their complaint the paragraphs which described their business, quoted their advertisement and stated that they "were the only persons in the city of Salem, Oregon, engaged in the radio repair business who so maintained a free pick-up service and who so advertised said service." The purpose of § 1-908, OCLA, was to rid the practice in defamation cases of the extreme common-law technical rules which governed such actions. Let us bear in mind that a demurrer was filed against the complaint, and that the case is before us upon a ruling which sustained a motion for an involuntary nonsuit. I am satisfied that the complaint does not state a cause of action. The defect is not a mere matter of pleading, but is a fundamental one which shows an inherent defect in the entire case.

From the foregoing, we see that the plaintiffs contend that since they were the only radio repairmen in Salem [so they allege] who offered "a free pick-up service", they were at once identified by readers of the article as slickers and operators of a radio racket. Actually their advertisement did not confine itself to "a free pick-up service" but to "Free pick-up delivery", but I shall pass by that variance.

Let us now see what developed upon the trial.

Following appearance of the article, the plaintiffs, acting together, searched through the local newspaper files to ascertain whether an advertisement of the kind mentioned in the article had appeared in the period of November 25 to December 4, 1946. In reporting the results of their search, the plaintiff, Robert Marr, gave the following testimony:

"Q  Did you look for advertisements of dealers in other items, which might be similar?

"A  No, sir.

"Q  Did you look for advertisements of radio dealers advertising pick-up and delivery service?

"A  No, we didn't look for that.

"Q  You are not prepared to say then, I take it, that there were not advertisements in newspapers preceding December 4th, of local radio service people advertising pick-up and delivery service?

"A  I will not say as to that.

"Q  You will not say there were not such ads?

"A  No, I won't say there were no such ads.

"Q  Do you happen to know the answer to the question as to whether or not there were ads of that kind frequently in the papers, preceding December 4th, 1946?

"A  You ask what?

"Q  I asked if you do know, as a matter of fact, from any search you may have made, whether other

repairmen in Salem advertised pick-up and delivery service in the Salem newspapers?

"A I don't know whether they did or not. I didn't look for that.

"Q Didn't you read other radio repairmen's advertising matter?

"A I think not."

If that testimony stood alone, the plaintiffs could not recover; but the prevailing opinion says: "John testified that he examined copies of the Capital Journal, the Statesman, and the Capital Press, another newspaper published in Salem, for the ten days immediately preceding the publication of the article and found no advertisement other than the plaintiffs', which was in substance the same as that described in the article." The examination of the newspaper files which the plaintiffs made was conducted by them jointly; that is, they were together and were cooperating. John's description of the examination and its results was very brief. He said that the plaintiffs sought to find "an article within the past ten days that could be the,— that the substance could be as this article mentioned." That was the only inkling that he gave as to the objective of the search: "an ad * * * that could be the,— that the substance could be as this article mentioned." His testimony included no details such as those which featured his brother's.

Two or three of the plaintiffs' friends searched through a single issue or a day's publication, but, in reporting the results of their searches, used qualifying phrases such as "It generally had a name—generally" or "I am pretty certain about it." Chance, however, gave this testimony:

"Q Do you mean to say that there are not other ads which have pick-up and delivery?

"A For pick-up and delivery of radios.

"Q  In the ads?

"A  Yes, in the ads. The Marr boys were in the radio business.

"Q  Yes, we understand that. But do you know there are other ads in that issue?

"A  Yes, which have only a telephone number. Yes."

If the testimony of the two plaintiffs, who are held by the majority to have been partners in the venture which preceded the filing of this action, was contradictory it cannot support the quoted paragraph of the complaint. Both men are plaintiffs and, as just stated, the prevailing opinion holds that they were co-partners in their little business venture. If the one testified at variance to the other, he destroyed his co-plaintiff's testimony and, in that event, the quoted paragraph of the complaint was left without support. Surely, under such circumstances, a court would not submit to the jury the issue as to which of the two plaintiffs told the truth. But, if the two plaintiffs did not testify in contradiction to each other, the fact must be that they had not examined the advertising files in quest for advertisements inserted by radio repairmen who offered pick-up and delivery service. In that event, we must assume that Robert's detailed testimony, in which he swore that no effort was made to determine whether or not the newspapers contained such advertisements, reflected the results of the search. If such was the case, the quoted averment was likewise without support; in fact, in that event, the averment was shown by positive testimony to have been untrue.

The above, I believe, suffices to dispose of this case. The very paragraph of the complaint by which the plaintiffs sought to fit the article to themselves lacks support in the evidence. Under the circumstances, there

is nothing which this court can do but sustain the judgment which is based upon the order of involuntary nonsuit.

There is still another reason which satisfies me that no error was committed when the motion for a nonsuit was sustained.

As I have pointed out, the plaintiffs sought to bring themselves within the terms of the article by alleging that they "were the only persons in the city of Salem, Oregon, engaged in the radio repair business who so maintained a free pick-up service and who so advertised said service." As I have shown, the averment was not supported by evidence, but, even if it had been, it could not have warranted anyone in applying the article to the plaintiffs. The publication did not say that all radio repairmen who offered free pick-up service and whose advertisements identified them only by a telephone number were slickers or unreliable. No such intimation was made in the article. To place such a construction upon it would be absurd. And, accordingly, no reader of the article would have been justified in concluding that the advertisement which appeared under the number of "Ph. 9098" was that of an unscrupulous person. The conclusion would not have been warranted even if the reader, after searching through the newspaper's advertisements, had found only the one inserted by the plaintiffs.

Let us see what the authorities say. In *Service Parking Corporation v. Washington Times Co.,* 92 F2d 502, the defendant's newspaper published an article which the plaintiff claimed was libelous. The heading of the publication was: "Parking Lot Racket Probe Ordered Here—Major Brown Says Chiselers Renting Space Move Cars to Streets; Even Pay Fines." The article which appeared under that heading stated that

the district attorney's office and the local police, acting under their superintendent, Major Ernest Brown, had instituted "a drive * * * to halt the chiseling of parking lot owners and garages." Continuing, it indicated that parking lot owners, after accepting cars, sometimes drove them off the lot and reparked them in the streets "thus allowing more space on the lots, and less on the streets." After reciting other facts to similar effect, the article said: "The police superintendent hoped that some automobile owner who finds his car parked on the streets, after placing it on a lot, will call police and place charges of 'obtaining money under false pretenses' against the parking lot owner." The complaint, which quoted the article, averred appropriate innuendo applying the article to the plaintiff-appellant. During the trial the plaintiff proved that in the downtown section of the city there were from twenty to thirty parking lots and that they were operated by ten or twelve owners. The plaintiff owned nine of the lots. The plaintiff then called a witness who testified that he was acquainted with the manager of the plaintiff's parking lots, that he had from time to time used the lots and that he had read the article. He was then asked whether or not he had formed an opinion from reading the article as to whom the latter applied. The defendant's objection to the question was sustained. The plaintiff then offered to prove by the witness that the latter understood the article to refer to the plaintiff and meant that the plaintiff was guilty of the course of conduct described in the article. The defendant's motion for a directed verdict was sustained. The decision under review affirmed both rulings. It said:

"To the general rule that opinion evidence is not admissible, an exception is recognized in libel

cases in some jurisdictions. It is held that if the defamatory statement does not name the plaintiff but does use terms or mention circumstances of an identifying nature, a witness who knows the parties and the identifying effect the terms and circumstances may state his opinion as to the application thereof to the plaintiff. * * * The testimony proffered in the instant case is not within the exception recognized in the cited cases. * * * The witness whose testimony was proffered in the instant case was not shown to possess any special knowledge of identifying terms or circumstances which put him in any better position than the jury to draw inferences as to the application of the article to the appellant."

Wigmore on Evidence, 3d ed, § 1971, is in harmony with the rule employed in that case. I quote:

" * * * the private *understanding of an individual hearer* (as distinguished from the ordinary sense of the words) cannot in theory be offered, until it is first shown that some circumstances was known to him which reasonably gave the words a special meaning."

The following is taken from 53 CJS, Libel and Slander, p. 311, § 201:

"In general, testimony of readers or hearers as to what they understood the alleged defamatory words to mean is inadmissible where the words are unambiguous and plain; but such evidence may be admitted where the meaning is doubtful or ambiguous or the words are actionable only by reason of extraneous facts."

The quotation which follows is taken from the same volume at page 316:

"As a general rule, testimony of witnesses who read or heard the defamatory charge that they understood it to refer to plaintiff may be admissible, especially where the words are ambiguous as to the

person referred to. However, it has also been held that, while whatever relevant facts outside the publication could have enabled a witness to form an intelligent opinion or understanding that an offensive term was intended to be applied to plaintiff may be placed before the jury, the opinion of a witness as to the intended application of the defamatory words to plaintiff is inadmissible unless at least peculiar circumstances are shown, either as respects the language employed or the manner of its utterance or publication, as, for instance, where the charge is made by equivocal expressions, insinuations, gestures, or intonations of voice.''

The rule which was employed in the Service Parking Corporation case, whereby the understanding of the readers is received only if they possess special knowledge of the meaning of the terms employed in the publication, has been adopted in this state. *State v. Mason,* 26 Or 273, 38 P 130, 26 LRA 779, was based upon a defamatory publication which, in seductive terms, dwelled upon a purported ''love nest'' and its frequenters. The location of the property and the identity of its owner were given in words which were indefinite and ambiguous. Witnesses were permitted to state their understanding that the article referred to the complaining witness. In holding that no error was committed, this court ruled:

''But, on the other hand, it is held, and we think with better reason, that when the words are ambiguous as to the person intended, and their application doubtful, persons who read the libel and are acquainted with the parties and the circumstances, may state their judgment and understanding as to whom the libelous charges referred.''

In that case, each witness, who was permitted to express his understanding, was familiar with the premises, its owner, and the use to which the property was devoted.

The jurors lacked the witnesses' first hand information. Thus, each witness had special qualifications which rendered his understanding admissible and lent significance to it. The understanding was admissible, not merely because the publication contained intended ambiguities, but also because the witnesses were specially qualified to express opinions of value.

Now let us take notice of the manner in which the witnesses in the instant case were permitted to express their understanding that the warning referred to the plaintiffs.

Mrs. Melum, after testifying that she was acquainted with the plaintiffs, their advertising, their shop and the article, was asked: "To whom did you think it referred?" At that point the defendants interposed an objection similar to the one which was sustained in the Service Parking Corporation case. The objection was lengthy and included the following: "I ask that the record show that the matter had been previously argued to Your Honor." The trial judge granted that request. He then overruled the objection, saying:

"The article will speak for itself. It is not claimed and I do not believe that it is ambiguous in its terms or the language used. With the understanding that the testimony is received solely for the purpose of identification of the individuals to whom it might refer, the objection will be overruled."

It is clear that the objection should have been sustained. Mrs. Melum answered:

"Well, I believe that it referred to Bill and Bob Marr's new business, because I had been looking for their advertising, now they were starting in the business. And looking for the advertising—it was practically on this same sheet of paper there was

their ad, with no address on it, which this item applied to. And I didn't see any other ads in there that gave the same reference. That is the reason I connected the two of them.''

The objection which was made to the question propounded to Mrs. Melum was repeated when similar questions were submitted to the other witnesses. In each instance the objection was overruled. Chance answered the question in this way:

"My first thought was that it was implying that the Marr boys or someone like the Marr boys were running a slicker racket, and since they were in that business, I thought that it applied to them or anyone else in that business.''

His answer, manifestly, was based upon a misinterpretation of the article. The latter does not say that all repairmen who advertised under a telephone free pick-up service were slickers. He, like Mrs. Melum, had no special qualifications for giving an opinion or offering an understanding concerning the application of the article to anyone. Everything that he knew about the case had been detailed by him in a hundred words or so of testimony. After he had divulged his knowledge, the jury was in as good a position as he to draw a conclusion as to whether or not the article was applicable to the plaintiffs.

Enough has been said to show that the objections should have been sustained. None of the witnesses possessed special qualifications for determining whether or not the article was applicable to the plaintiffs. When an issue concerning the application of an ambiguous publication, purportedly defamatory, is submitted to a jury, the latter resolves the issue in obedience to the instructions of the presiding judge, but when the witnesses in a case such as this are permitted to offer

their "understanding" they do so without any help whatever from the rules which govern the construction of language. It will not do to try to justify the reception of such evidence by saying that the witnesses merely voice the reactions of the readers or the hearers. As will be seen from the answers which I quoted from the witnesses in this case, they attempted to construe the article. They essayed to duplicate the work of a judge or a juror. Manifestly, the witnesses, in making their attempted constructions, were influenced by their special interest in the plaintiffs. The circumstances of which I have taken notice commend the wisdom of the rule which excludes all opinions and understandings unless (1) the utterance under scrutiny was ambiguous and (2) the witness possessed qualifications superior to those of the twelve men in the box. The presiding judge, after he had heard extensive argument, ruled that the article was not ambiguous. The appellants do not contend that he erred when he so ruled. No claim whatever is made that the four witnesses who were permitted to express opinions possessed special qualifications. I repeat, the objections should have been sustained.

Notwithstanding the fact that the "understanding" or "opinion" testimony should not have been received, the prevailing opinion features it and ascribes superior cogency to it. In fact, although only four witnesses gave their "understandings", the majority say, in the terms which I quoted in a preceding paragraph, "at least ten of their friends and acquaintances, who knew about their business venture and their method of conducting it, at once thought that it was the plaintiffs who were the object of the libel." That statement shows the extent to which the rule given in *State v. Mason*, supra, is violated in holding that all of the

aforementioned testimony was admissible and entitled to consideration by this court.

I now return to the Service Parking Corporation decision. The court in that action took note of the rule employed in libel cases which does not permit a member of a large class, allegedly defamed by a publication, to maintain an action, but which allows a member to proceed with an action if the group is sufficiently small. The decision, written by capable Justice Stephens, in that case said:

> "The rule thus stated by the courts and text writers represents, undoubtedly, what has been regarded as a sound compromise between the conflicting interests involved in libel cases. On the one hand is the social interest in free press discussion of matters of general concern, and on the other is the individual interest in reputation. The courts have chosen not to limit freedom of public discussion except to prevent harm occasioned by defamatory statements reasonably susceptible of special application to a given individual."

The court quoted the following from Odgers, Libel and Slander (6th ed, 1929), page 123:

> "The defamatory words must refer to some ascertained or ascertainable person and that person must be the plaintiff."

and then ruled:

> " * * * The jury could not reasonably have concluded from the appellant's evidence that the article referred 'solely or especially' to him. Putting it otherwise, we think that the jury must reasonably have concluded that the article was 'published against a class or aggregate body of persons * * *.' Giving the appellant the benefit of all legitimate favorable inferences, the article could not reasonably be said to concern more than downtown parking lots and their owners as a class. There is no language referring 'to some ascertained

or ascertainable person.' Nor is the downtown class so small, as shown by the appellant's evidence, as to cause defamation of it to defame the appellant.''

In *Watts-Wagner Co. v. General Motors Corporation,* 64 F Supp 506, the plaintiff sought to accomplish the very purpose which our two plaintiffs seek. The plaintiff in that case was unsuccessful. The articles in that case spoke of an ''army of racketeers who are sweeping the country'' and selling to ''unwary car owners'' worthless panacea for battery troubles. The phrase ''army of racketeers'' was possibly an extravagant one, but, since it was the one which the defendant used in its publications and by which it defined those with whom its warnings dealt, the court held that it (the word ''army'') governed the issue as to whom the articles were applicable. The court repulsed all efforts of the plaintiff to contract or reduce the ''army'' to a few persons and, more especially, to shrink the ''army'' down to the plaintiff itself. For instance, the plaintiff, in seeking to deflate the term ''army'' and make the attacked publication fit the plaintiff, claimed that (1) the defendant had the plaintiff and the latter's product in mind ''when this statement was made'', and (2) notwithstanding the publications' use of the word ''army'', the purportedly defamed class was, in fact, ''a small one''. The efforts failed. Thus, the plaintiff in that case, as the plaintiffs in the case at bar, sought to rewrite the article so that in its rewritten form it would fit and become applicable to the plaintiff. The court repelled the efforts by ruling:

''* * * if it is not apparent from a fair reading of them [the articles] that the statements concerned the plaintiff, a cause of action may not be read into them by the claim that the plaintiff was the intended party, or by extending their meaning through innuendo.''

Even a hasty glance at the article upon which the plaintiffs in this case rely shows that it was concerned with the evil practices of a sizeable group of wrongdoers. Common sense would induce any reader to infer that the "slickers" possibly were not local residents but were very likely transients or fly-by-nights who move on and are gone before their guilt catches up with them. In short, the article spoke of a considerable number, fungible in nature, and unknown in exact size. And yet the majority permit the plaintiffs to reduce the number to two, that is, to the two plaintiffs. In fact, since the majority hold that the plaintiffs are a partnership, they reduce the number down to a single small business unit. In that way the article is rewritten. Likewise, in that way a newspaper publisher, who carefully chose his words, is deprived of control over them.

*Newton v. Grubbs,* 155 Ky 479, 159 SW 994, 48 LRA(NS) 355, was based upon a slander action in which the defendant was a physician and the plaintiff was a former patient of his. According to the record in that case, the defendant had related to several persons an experience in his practice which he had with a young woman. In relating the experience, he never used the plaintiff's name and never disclosed the former patient's identity, but, in some unexplained way, the plaintiff's name became associated with the episode and several witnesses testified that when the defendant related the experience they thought that he had the plaintiff in mind and identified her. I now quote from the decision:

"Clearly appellee [defendant] was entitled to a peremptory instruction; and, that being true the other questions made need not be noticed. The fact that persons to whom appellee told this incident

thought at the time from outside rumors that he referred to appellant, when in fact he did not, cannot make him liable.''

*Mueller v. Radebaugh,* 79 Kan 306, 99 P 612, is a further illustration of the holdings which permit the writer or publisher to retain control over his words.

The decision said:

"The petition alleges that the article was published of and concerning the plaintiff, and the main contention is that the court erred in refusing to permit a number of witnesses to testify as to whom they understood the article referred when they read it. The general rule is that it is for the jury to say what person the alleged defamatory words referred to. This doctrine is laid down in Newell on Slander and Libel, 767, as follows: 'But witnesses cannot be called upon to state to whom they understood the defamatory matter to refer.' There is some conflict in the authorities upon the question, and there may be circumstances under which evidence of the character may be admitted. No such circumstances are shown here. Moreover, from our view of the case, the decision of the question becomes unnecessary. There is nothing in the article itself that can be called libelous. It appears on its face to have been published in a bona fide effort by the defendant to recover his stolen property and to bring to justice the guilty persons. There is not a word of the evidence which in our opinion tends to contradict this. This is not a case where a libelous charge is imputed by insinuations or equivocal expressions which require extraneous testimony to explain. Not only does the article make no reference by description or circumstance which would tend to identify the plaintiff, but there is nothing in the language which would lead the casual reader to suppose that defendant had any person in view as guilty of the crime. It is like the everyday occurrence of offers of reward for stolen property. It

accuses none but the guilty persons, whoever they may be. The persons by whom it was sought to prove their understanding were acquainted with the fact that the defendant had suspected the plaintiff of taking the goods. From the knowledge of these circumstances, it is claimed that they understood the article to refer to the plaintiff; but they might have been mistaken notwithstanding their knowledge of the extraneous facts. There is nothing in the article which justified them in assuming that it referred to the plaintiff. The defendant might have suspected the plaintiff at one time, and then have become satisfied of her innocence and have published the article in the best of faith. The plaintiff would hardly contend that she was known to be the only person in that county in the habit of giving Christmas presents, or that she was known to be the only person liable to make presents of silks or shirt waist patterns; and otherwise no one would understand that the article referred to her.''

I return to *State v. Mason,* supra, and this time quote from it as follows:

''In either case it is incumbent on the plaintiff or prosecution to show by proper averments and proof that the defendant intended to apply the words used to the plaintiff or person designated in the indictment as the subject of the libel; and evidence competent in the one case must necessarily be so in the other. The object and purpose to be attained by such evidence is the same in civil and criminal cases, and the reason and necessity for its admission applies with equal force to both classes of actions.''

It must be clear that the defendant never intended to apply the words of the questioned article to the plaintiff.

I deem it unnecessary to resort further to the authorities. I am satisfied, for the many reasons stated above, that the circuit court properly sustained the

defendants' motion for an involuntary nonsuit and that it properly entered judgment for the defendants. The action taken by this court, I believe, is fraught with danger for that invaluable right known as freedom of communication.

I believe that the testimony upon which the majority principally rely was inadmissible. I also believe that the publication was nonambiguous and incapable of the construction which the plaintiffs place upon it. The judgment for the defendants should be affirmed.

I dissent.

LATOURETTE, J., dissenting.

I dissent for the reason that I am of the opinion that the nonsuit granted by the trial court was proper. It is the law, recognized by the majority opinion, that two parties cannot join in a personal libel action because the action is several and not joint. The following is set out in such opinion:

"While it is well settled that when words are spoken of two or more persons they cannot join in an action for the words because the wrong done to one is no wrong to the other, a well recognized exception to this rule is where defamatory words are published of partners in the way of their business. Newell, op. cit., 343, § 307; Odgers, op. cit., 475; LeFanu v. Malcomson, supra; Weitershausen v. Croatian Printing & Publishing Co., 151 F 947; Wright v. Afro-American Co., 152 Md 587, 137 A 273, 52 ALR 908, with annotation at p. 912 in which numerous cases supporting the exception are digested."

All the authorities which I have read agree that the one "exception" in a case of this character is where a partnership relationship exists. The complaint does not allege the existence of a partnership between the plaintiffs. In my opinion, the complaint reveals an

action by the plaintiffs to recover for a personal libel. They allege that "said publication has injured plaintiffs in their persons, reputations and business in the sum of * * * ."

It is axiomatic that where a libel is published a party libeled is entitled to damages for hurt feelings, embarrassment, etc., and if his business is damaged thereby, as a natural and proximate consequence of the libel, he may recover damages resulting from loss of business. 33 Am Jur, Libel and Slander, 80, § 63. It is obvious that a partnership cannot suffer hurt feelings, embarrassment or disgrace; it can only suffer damages to its business.

From the following language in the opinion, it appears that in addition to the partnership exception, there is now being introduced a further exception unknown to law:

"The evidence as to the relationship between the plaintiffs discloses that they were partners in the radio repair business. This evidence came in without objection and was clearly admissible under the allegations of the amended complaint. That pleading showed a joint interest of the plaintiffs in the subject matter of the action and a joint injury for which they were entitled on proper proof to recover a joint judgment. To maintain such an action it was not essential that the plaintiffs allege a partnership. It was enough that they stated facts from which it appeared that they were jointly interested. It is immaterial that they could not recover a joint judgment for injury to their reputations, for, if the publication affects the plaintiffs in their joint capacity, they may sue jointly. 37 CJ, Libel and Slander, 19, § 321. If a complaint states grounds for any kind of joint relief a demurrer for misjoinder of parties plaintiff cannot be sustained. 1 Bancroft's Code Pleading, Practice and Remedies (10 Year Supp) 111, § 204; Speyer

v. School Dist., 82 Colo 534, 261 P 859, 57 ALR 203.''

The following is the text in CJ, supra:

'' * * * Where defamatory matter is published of two or more individuals, each or either of them may sue therefor. If several persons are injured by the same publication, they must sue alone, unless it can be so construed as to affect them jointly; but if the publication affects them in a joint capacity, they may sue jointly.''

The above is good law when properly applied. Under the text there are cited in the footnotes a number of cases. None of them appears to sustain the position of the majority. In all of the cases cited where a joint action was upheld, they were partnership actions, with one exception. In an early English case two parties were permitted to join under the Judicature rule. However, in a later case the court overruled on the ground that the rule did not apply since the interests of the parties were several and not joint.

The opinion cites 1 Bancroft's Code Pleading, Practice and Remedies (10 Year Supp) 111, § 204, and *Speyer v. School Dist.*, supra, and 57 ALR 203. The authority for the text in Bancroft is the Colorado case, and ALR merely quotes the Colorado case verbatim. That case was a suit in equity brought by aggrieved merchants for an injunction to restrain the school authorities from enforcing a rule that the pupils' lunches should be eaten in the schoolhouse. The complaint also asked for damages. The court held that there was no misjoinder so far as the injunction suit was concerned, stating:

''The arguments upon the first ground are: (1) That since the shops of the plaintiffs are separate and several, they have no common title or interest which is injured by defendants' conduct and so

have no common equity; (2) that the business of each plaintiff is the 'subject' of his particular action, and hence they cannot be joined under §§ 10 and 12 of the Code; and (3) that they are asking joint damages when it is obvious that only several damages can be proved.

"Upon the first point the plaintiffs have a common equity in that the injunction in favor of one would accomplish the purpose of all. The common analogue is the suit to enjoin a nuisance; one or more injured by its maintenance may sue for all so injured. * * *

"As to the second point counsel is mistaken in supposing that it is the property or business of each plaintiff that is the subject of the action. Just as in case of a nuisance it is not the injured property of the plaintiffs that is the subject, but the right to be protected from the alleged nuisance. This is the sense in which 'subject' is used in Cadigan v. Brown, supra. * * * So here it is not the plaintiffs' injured business but their common right of protection from inequitable conduct which is the 'subject of the action,' and the relief demanded is the injunction which protects that right.

"As to the third point the demand for relief does not determine the relief that may be granted, and, if the complaint states any ground for any kind of joint relief, the demurrer cannot be sustained for misjoinder of plaintiffs. A demand for legal relief does not destroy a complaint good in equity. * * * "

The majority selects and quotes the following sentence from *Weitershausen v. Croatian Printing & Pub. Co.*, 151 F 947, 948:

" 'It results, therefore, that all persons injured by libel or slander, and having a community of interest as to the subject-matter of defamation, may sue either jointly or severally, and, if the matter complained of be libelous per se, it is no more necessary to allege special damage in the joint action than it is in the several suits.' "

The opinion in that case commences as follows: "The plaintiffs are copartners under the firm name of 'Chas. R. Weitershausen Agency.' "

So then it appears that no authority has been cited to sustain the opinion's novel idea of "joint interest". On the face of it, such a theory is untenable. A libel under the circumstances of this case must either, of necessity, be a personal libel or a partnership libel. There is no middle ground.

Returning to the above quoted portion of the opinion, we find this language:

> "The evidence as to the relationship between the plaintiffs discloses that they were partners in the radio repair business. This evidence came in without objection and was clearly admissible under the allegations of the amended complaint."

The opinion does not point out the evidence which shows the existence of a partnership. Assuming, but not admitting, that to be a fact, this would avail plaintiffs nothing. It is well-known that a general demurrer tests the sufficiency of a complaint rather than the evidence. Plaintiffs might have amended to conform to the proof, if any, but this was not done.

It appears elementary to me that where members of a partnership are permitted to bring a partnership action the complaint must allege the existence of the partnership, the names of the members of the firm and the cause of action accruing to them as partners. In relation to pleading a partnership, I wish to note the early case of *Clark v. Wick*, 25 Or 446, 448, 36 P 165, in which we said:

> " * * * An allegation of partnership is only necessary when the cause of action depends on its existence: Abbott's Trial Evidence, § 203; Loper v. Welch, 3 Duer. 644. If the action is brought on

an obligation made payable to a partnership in its firm name, it is, of course, necessary to allege the partnership, that plaintiffs compose the firm, and that the contract was made by them in that name. Of this character are the cases cited by counsel for the defendant.''

In Bliss, Code Pleading, 244, § 145, we read:

''It is not absolutely necessary that the title describe the parties as partners and give the partnership name, provided the facts appear in the body of the complaint; but it is always best to do so.'' See 4 Bancroft, Code Pleading, 3800, § 2141.

In the case of *Flower v. Barnekoff,* 20 Or 132, 143, 25 P 370, speaking through Mr. Justice ROBERT S. BEAN, we said:

''A partnership is usually defined to be a voluntary contract between two or more competent persons to place their money, effects, labor and skill or some or all of them in lawful commerce or business, with the understanding that there shall be communion of the profits and losses thereof between them. * * * Partnership and community of interest, independently considered, are not always the same thing, *nor is a mere community of interest sufficient,* but there must be an agreement to share the profits and losses, and such profits must be shared as a result of the adventure or enterprise, in which both are interested and not simply as a measure of compensation. * * * Profits may be, and in fact often are, received as mere compensation in case of service or special agency where the employe has no interest in the business or power as such, but is employed as a servant, special agent or broker, and is to receive a given proportion of the profits as compensation for his services. In such case the receipt of profits does not constitute a partnership.'' (Italics mine.)

In the case of *Spencer v. Wolff,* 119 Or 237, 246, 243 P 548, we quoted with approval the language used

in the Flower case, supra. See *Shebley v. Quatman,* 66 Or 441, 134 P 68; *First Nat. Bank of Eugene v. Williams,* 142 Or 648, 20 P2d 222.

In the case at bar all that can be said for the amended complaint is that the plaintiffs allege a mere community of interest, which interest is not disclosed by the pleading.

We must remember that in this case a general demurrer was filed against the amended complaint and a nonsuit granted in favor of the defendants. In this court defendants in their brief reiterated the failure of the complaint to state facts sufficient to constitute a cause of action. The fact that they did not urge the question now being discussed is immaterial, for, in many instances, we have held that a complaint may be attacked for the first time in this court for insufficient facts. Indeed, we have held that on our own motion we may raise the point.

Inasmuch as the plaintiffs cannot join in a personal libel action, and a partnership has not been pleaded, the nonsuit was properly granted. I would affirm.

There is another reason, in my opinion, why the nonsuit was properly granted, and that is that the words used in the alleged libelous article could not, under the evidence in this case, have referred to the plaintiffs. In 53 CJS, Libel and Slander, 52, § 11, we read: "Defamatory words, in order to be actionable, must refer to some ascertained or ascertainable person, and that person must be plaintiff." The article itself, of course, does not specifically mention the plaintiffs. Following is the portion of the article on which plaintiffs based their contention that it referred to them:

" 'Established radio dealers and repair plants in the city are becoming alarmed over what appears to be a "radio racket" which causes owners to lose

their sets and much embarrassment upon the part of the dealer.

" ' "The common practice of these slickers is not to operate from any established shop but just give a phone number to call and offer free pick-up service," ' ' according to Ray Moore, 3720 Portland Road, who has had personal experience along this line.

" ' " * * * In some cases the customers were told that the radios would be taken to some well-known or established shop * * * ." ' ' "

Plaintiffs' evidence clearly shows that their place of business was an established shop. Their shop was located in the home of one of plaintiffs and consisted of tools and equipment necessary to carry on their radio repair business. It is conceded in the majority opinion that plaintiffs were operating a repair shop, but it is urged that whether or not the shop was an "established" shop was a question for the jury. With this I disagree. By § 5-305, OCLA, the construction of writings is to be decided by the court. The exception to this principle of law, however, is where the writing is ambiguous and the construction depends upon disputed or doubtful facts. We find the following language in *Johnson v. Shively,* 9 Or 333, 334:

" * * * The rule of law is considered to be well settled, that the construction of a written instrument is a matter of law for the court to define its terms and legal effect from the language used. The exception to this is when the meaning and construction depend upon instrinsic facts which are doubtful and disputed. (Edelman v. Yeakel, 27 Penn. St., 26.)"

The use of the word, "intrinsic", in the above quotation is obviously a printer's mistake since, in the original opinion on file in this court, the word, "extrinsic", instead of "intrinsic" is used. The case of *Edelman v. Yeakel,* supra, contains the following language:

"* * * When the meaning of a paper cannot be ascertained without reference to extrinsic facts which are doubtful or disputed, it must of necessity be left to the jury."

See, also, *California Well Drilling Co. v. California Midway Oil Co.*, 178 Cal 337, 177 P 849; *Keyser v. Kemper*, 157 Md 437, 146 A 275, 65 ALR 641.

In the instant case, the facts relating to plaintiffs' shop are undisputed; therefore, assuming that the article is ambiguous, it is the duty of the court to construe the article in the light of the undisputed facts in the case.

There is another rule of law, assuming that the article is ambiguous, and that is that a writing must be construed to the end that good faith may be imputed over bad faith. *Salem King's Products Co. v. Ramp,* 100 Or 329, 355, 196 P 401. In *Miller v. Gold Beach Packing Co.*, 131 Or 302, 310, 282 P 764, we said:

"The rule of construction which requires a court to place upon a writing a lawful purpose, rather than one which is opposed to public policy, is available only when such a construction will not do violence to the plain meaning of the words."

If the alleged publication is libelous per se, the defendants would be guilty of a violation of the criminal law.

In my opinion, the language used in the purported libel is not susceptible of two meanings and is unambiguous, according to the plain meaning of the words used. The alleged libel states, " ' "The common practice of these slickers is not to operate from any established shop * * * " ' ", so that if plaintiffs were operating from an established shop, they, of necessity, would be excluded from the meaning of the published article.

The majority urges that "established" is used in

three places in the article, and that all of the language should be construed in arriving at the true meaning of the article. With this I agree.

It is contended that, taking the article by and large, it could refer to persons not operating from well-known, established shops. The article will not bear out such meaning. Paraphrasing the above paragraphs of the article, we have the following clear, unambiguous meaning: Established radio dealers and repair plants are becoming alarmed because slickers not operating from any established shop tell their customers that radios would be taken to some well-known or established shop. The entire article is qualified to the extent that its applicability was confined to those radio repairmen who do not operate from an established shop rather than from a *well-known*, established shop. The evidence in this case is uncontradicted, and the language of the published article is clear and unambiguous. Taking the evidence at face value, the legal meaning of an "established" shop, and the language of the alleged libel, it becomes a matter of law for the court to determine and is not a jury question.

Because of their operating from an established shop, plaintiffs, by no stretch of the imagination, could be considered as libeled by the published article. In fact, they would be included in the category of those who are "alarmed" over the radio repair racket.

In *Egan v. Finney,* 42 Or 599, 603, 72 P 133, this court cited *Smith v. Forrest,* 49 NH 230, in which "establish" was defined as follows: " 'The ordinary meaning of the word is to settle certainly, or fix permanently, what was before uncertain, doubtful or disputed.' " In the case of *Allen v. Commonwealth,* 188 Mass 59, 74 NE 287, the court held that a farmer who grew farm produce and sold the same to customers

in a village had an established business on his farm, although he had no regular route for customers.

Taking the definitions of "established" quoted by the majority opinion, which are " 'made stable or firm' ", " 'settle securely, as in a business' ", and " 'to get up on a secure or permanent basis' ", I believe the plaintiffs' shop fits squarely into the quoted definitions. Plaintiffs' shop, although not in operation for any great length of time, was stable and settled securely. Whether or not a business is an established business does not depend upon the length of time the business has been in operation so long as it has a fixed situs, is secure and on a permanent basis. The business is not less established because in a short time it goes into bankruptcy or is terminated for any other cause. Plaintiffs' business shop was not as pretentious as some larger shops, but it fitted their requirements. The fact that they had no telephone or did not serve customers from their shop would not make it less an establishment. It is well-known that some electricians, plumbers, florists, farmers, seamstresses, radio repairmen and other people have places of business in their homes but serve their customers elsewhere.

A case quite in point is *Merrill v. Post Publishing Co.*, 197 Mass 185, 83 NE 419, in which a newspaper article concerning a feud between plaintiff's relatives who lived in the "same house" was held to be not libelous as to plaintiff since he did not live in that house.

Since the article in question referred explicitly to those radio operators who did not operate from established shops, obviously the article did not refer to plaintiffs, and, therefore, they were not libeled by the publication. I dissent.